**UNITED STATES DISTRICT COURT**
**EASTERN DISRICT OF NEW YORK**
..............................................................................................X
**SUSAN ROLLINS, Individually, in Her Own Right and as**
**Administrator of the Estate of KEVIN J. ROLLINS,**          **Case No. 22-CV-808**
**Deceased,**

                                **Plaintiff,**

                                -against-

**COUNTY OF NASSAU, NASSAU COUNTY**
**CORRECTIONAL CENTER, NASSAU COUNTY**
**SHERIFF'S DEPARTMENT, VERA FLUDD,**
**Individually and as former Sheriff of Nassau County,**
**NASSAU UNIVERSITY MEDICAL CENTER, NASSAU**
**HEALTH CARE CORPORATION, a/k/a NUHEALTH**
**SYSTEM, NASSAU COUNTY CORRECTIONS OFFICERS**
**"JOHN DOES 1-10," in their Individual and Official**
**Capacities (whose names are fictitious but intended to**          **VERIFIED**
**represent and designate various presently**          **COMPLAINT and**
**unidentified Nassau County Corrections Officers who**          **JURY DEMAND**
**had responsibility for the care, health and safety of the**
**Deceased), and NASSAU UNIVERSITY MEDICAL**
**CENTER and NASSAU HEALTH CARE CORPORATION**
**EMPLOYEES and AGENTS**
**"JOHN and JANE DOES 11-20," in their Individual and**
**Official Capacities (whose names are fictitious but**
**intended to represent and designate various presently**
**unidentified Nassau University Medical Center and**
**Nassau Health Care Corporation employees and agents**
**who had responsibility for the medical care, health care**
**and safety of the Deceased),**

                                **Defendants.**
..............................................................................................X

        Plaintiff, by her attorneys, The Pascarella Law Firm, PLLC, for her Verified

Complaint against the defendants herein, alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action that arises out of the needless, shameful, wrongful and preventable death of Kevin J. Rollins (hereinafter, "Rollins"), a 28-year-old young man, while he was an inmate pre-trial detainee in the care and custody of the defendants Nassau County (the "County"), the Nassau County Sheriff's Department ("NCSD"), then Nassau County Sheriff Vera Fludd ("Sheriff Fludd" or "Fludd") and the staff of the Nassau County Correctional Center ("NCCC") (all of the foregoing defendants sometimes referred to herein, collectively and alternatively, as the "municipal defendants") and in the health and medical care of the staff of the defendants Nassau University Medical Center ("NUMC") and Nassau Health Care Corporation ("NHCC") during Rollins' detention at the NCCC.

2.      At all relevant times herein, it was the duty and obligation of NUMC and NHCC to administer to the health needs of and to medically tend to and treat the inmates of the NCCC.  Concomitantly, it was the duty and obligation of the County, then Sheriff Fludd, the NCSD and the staff of the NCCC to care for, protect and ensure the health, safety and welfare of the said inmates.

3.      NUMC and NHCC had entered into a contract with the County, in May 2017, to provide health services and medical services and treatment for the inmates of the NCCC, which contract was (and is) in full force and effect at all relevant times herein, including to the present time.

4.      Rollins was denied competent, necessary, medically obvious and timely health and medical care by the defendants.

5.      Defendants unconstitutionally, recklessly and with callous indifference,

withheld or failed to provide health and medical care and treatment for his drug addiction and failed to prevent Rollins and other inmates from having access to contraband, including illegal drugs, while incarcerated at the NCCC.

6.      Defendants also failed to introduce obvious safety measures to protect inmates of the NCCC, including Rollins.  Such actions and failures to act, and, therefore, failure to protect, of the defendants led to Rollins' needless, agonizing and wrongful death from a fentanyl overdose on December 28, 2018.

7.      Plaintiff seeks redress against the defendants for their intentional, unconstitutional, reckless and otherwise tortious conduct and for the deliberate indifference exhibited by these defendants, including, without limitation, with regard to policies, customs, practices, protocols, training of personnel, supervision of personnel, due process and the humane treatment of individuals that deprived Rollins of necessary medical attention, protections necessary for his safety and well-being, his constitutional entitlements and of his life.

8.      Defendants had and have known about the deficient, incompetent, unprofessional and negligent health care and medical care and treatment of inmates at the NCCC for many years and had and have failed to make reasonable, necessary and effective efforts to remedy the situation.  Simply put, they continued living their past history.

9.      Defendants also were aware of contraband, including narcotic and dangerous drugs, being a continuous and pernicious presence at NCCC, posing and constituting a serious threat to inmates' health, medical well-being and safety.

10.     A virtual open door to contraband existed at the NCCC, and neither the

municipal defendants nor NUMC and NHCC took reasonable, necessary and effective measures to curb the flow of contraband into the NCCC.  Such contraband was currency at the NCCC for years prior to Rollins' overdose death, and defendants were aware of this.

11.     The municipal defendants did not have a sufficiently aggressive facility-wide search policy or protocol to prevent or control the widespread introduction of contraband drugs into the NCCC.

12.     Therefore, Rollins, a drug  addicted inmate, was especially vulnerable under the circumstances, and the defendants' failure to protect him was in violation of Rollins' constitutional rights, including under the Fourteenth Amendment to the Constitution of the United States.

13.     In fact, a *Newsday* investigation of the contraband drug problem at the NCCC, set out in an article in that newspaper, dated January 2, 2021, found there were 237 confiscations of illegal drugs and drug paraphernalia at the facility between 2016 and the summer of 2019, and many of the seizures contained multiple substances.  One can only wonder how many drugs were never confiscated, making their way into the bodies of vulnerable inmates.

14.     *Newsday* staff, in their investigation, reviewed data from hundreds of reports on drug contraband seizures at the NCCC that are kept on file at the New York State Commission of Correction (hereinafter, "NYSCOC") after obtaining the records through the Freedom of Information Law.  The data covered a 45-month period from 2016 through the summer of 2019.

15.    There is a long and pervasive history of failures to protect the safety of inmates and of deficient health and medical care at the NCCC so as to establish a pattern of deficient health and medical care.

16.    In fact, the years of failure to provide adequate health and medical services and care at the NCCC by NUMC and NHCC eventually led to Nassau County terminating its contract with those entities and, subsequently, contracting with Armor Correctional Health Care Services, Inc. and Armor Correctional Health Care Services of New York, Inc., (the "Armor entities" or "Armor") in or about May, 2011, to provide such health and medical services and care, which began on June 1, 2011.

17.    As it turned out, the Armor entities failed to provide reasonable and proper health and medical care to an even greater degree than had NUMC and NHCC previously.

18.    This was due to an inadequate vetting process by the County, the Sheriff and the NCSD and, further, due to the municipal defendants making saving money on inmate health and medical care and safety a priority over inmates' well-being.

19.    As a consequence of the Armor entities' failures, they were sued by many NCCC inmates and the estates of many inmates whose detentions became death sentences, and, eventually, even by the Attorney General of the State of New York on behalf of the State, leading to a termination of the contractual relationship between the County and the said Armor entities in 2017 and a ban on the Armor  entities performing inmate health and medical care services in New York State.

20.    Failing to reach agreement for medical and health care services for NCCC inmates with any other entity, defendant Nassau County turned, once again, in 2017, to defendants NUMC and NHCC to provide such services, even though NUMC and NHCC,

who were financially strapped, were ill-equipped, ill-staffed and ill-prepared to provide necessary and proper health and medical care to the inmates of the NCCC.

21.     For example, only, NUMC's and NHCC's financial difficulties and staffing difficulties were even more pronounced and precarious than they were in 2011, thereby further limiting those defendants' capabilities to provide necessary and proper health and medical care services to inmates of the NCCC.

22.     The aforesaid pattern of deficiency demonstrates actual knowledge of the County and all other defendants.

23.     The said well-worn pattern of deficient health and medical care established, constituted and became policies, practices and customs of the defendants, which continued through all relevant time periods herein.

24.     The ever-present flow of dangerous contraband into the NCCC and into the hands of inmates established, constituted and became policies, practices and customs of the defendants, which continued through all relevant time periods herein.

25.     Allowing such policies, practices and customs to come into existence, to continue and to persevere constituted deliberate indifference on the part of the defendants.

26.     The significant pattern of similar violations of health and medical care at the NCCC signified a need to train and to supervise.

27.     The significant pattern of the flow of contraband drugs into the NCCC signified a need to train, to supervise and to properly equip staff.

28.     The County, NCSD, NCCC and Sheriff Fludd failed to properly equip staff

with the tools and equipment needed to stem the flow of illegal drugs into the NCCC.

29.     The County, NCSD, NCCC and Sheriff Fludd failed to train and to supervise or to adequately train and to adequately supervise NCCC staff, including corrections officers and medical staff, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including Rollins.

30.     There was an obvious need for such training to avoid the violation of Rollins' (and other inmates') constitutional rights, and the said municipal defendants failed to correct the situation regarding this need for training.

31.     There was a pattern of similar constitutional violations by untrained or improperly trained employees and agents of the aforesaid defendants.

32.     There was a direct causal link between the aforesaid inadequate training and the deprivation of Rollins' constitutional rights.

33.     The aforesaid municipal defendants failed to establish a policy or practice that would protect Rollins (and other NCCC inmates) against deficient health and medical care and to protect his safety while incarcerated.

34.     NUMC and NHCC failed to train and to supervise or to adequately train and to adequately supervise NCCC health and medical care staff and corrections officers, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including Rollins.

35.     There was an obvious need for such training to avoid the violation of Rollins' (and other inmates') constitutional rights, and NUMC and NHCC failed to correct the situation regarding this need for training.

36.     Importantly, there was a pattern of similar constitutional violations

by untrained or improperly trained employees, agents and subcontractors of NUMC and NHCC at the NCCC in the past (prior to June 2011) when these same defendants provided health and medical services to inmates before resuming such services in 2017.

37.     NUMC and NHCC failed to establish a policy, custom or practice that would protect Rollins (and other NCCC inmates) against deficient health and medical care and exposure to contraband narcotic drugs.

38.     There was a direct causal link between the aforesaid inadequate training and the deprivation of Rollins' constitutional rights.

39.     There was an obvious need for supervision of NCCC staff, including corrections officers and health and medical staff, to avoid violation of Rollins' (and other inmates') rights, and the municipal defendants and NUMC and NHCC failed to adequately supervise the aforesaid staff.

40.     Various supervisors employed by the County and the NCSD, including Sheriff Fludd, directly participated in the constitutional violations alleged herein.

41.     Various supervisors employed by the County and the NCSD, including Sheriff Fludd, promulgated, created, implemented and/or were responsible for or acquiesced in the continued operation of policies, practices or customs that violated the Constitution of the United States.

42.     Various supervisors of NUMC and NHCC directly participated in the constitutional violations alleged herein.

43.     Various supervisors of NUMC and NHCC promulgated, created,

implemented and/or were responsible for or acquiesced in the continued operation of policies, practices or customs that violated the Constitution of the United States.

44.     Municipal policies, customs and/or practices were the moving force behind or cause of the constitutional violations of Rollins' rights.

45.     NUMC's and NHCC's policies, customs and/or practices were the moving force behind or cause of the constitutional violations of Rollins' rights.

46.     In contravention of their duty and obligation to provide proper health and medical care services for inmates at the NCCC and to insure those inmates' safety, and in violation of the constitutional rights of those inmates, the municipal defendants ignored the specific findings and recommendations relating to specific deficiencies and failures at the NCCC, at various points in time, of the NYSCOC, a lawful and duly constituted agency of the State of New York tasked with the duty to investigate and oversee the care provided by correctional and holding facilities within the State.

47.     Defendants' deficiencies, incompetence, medical negligence and actions and failures to act caused the wrongful death of Rollins.

48.     This action is brought seeking monetary relief, including compensatory, punitive and pecuniary damages, costs, including legal fees, and declaratory and injunctive relief.

## JURISDICTION AND VENUE

49.     The within action is authorized by and brought pursuant to the laws of the United States, including 42 U.S.C. §§ 1983 and 1988, the United States Constitution,

including the Fourteenth Amendment of the said Constitution, and the laws and Constitution of the State of New York.

50.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court may grant injunctive relief as authorized by 28 U.S.C. §§ 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

51.     Plaintiffs further invoke the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. § 1367.

52.     Venue is proper in the Eastern District of New York under 28 U.S.C.  § 1391(b)(2) because it is where the events giving rise to this action occurred.

## PARTIES

53.     Plaintiff Susan Rollins is the natural mother of decedent Rollins and lives in West Babylon, in Suffolk County, New York, in the Eastern District of New York.  She was appointed administrator of the estate of Rollins via limited letters of administration issued on or about February 27, 2019.

54.     Rollins, the deceased, was a high school graduate who attended community college and needed three more credits to obtain an associate degree.

55.     Rollins' vocational training included on-the-job training as a butcher in various of the jobs that he held over a course of years, and he rose to the position of assistant manager of the butcher department at a large food store.

56.     Rollins resided in West Babylon with his mother, Susan Rollins, until his incarceration at the NCCC on or about April 3, 2018.  He remained at the NCCC until the morning of December 27, 2018, at which time he was transported from his cell area by

10

ambulance to NUMC, where he was pronounced dead on December 28, 2018, at 4:12 p.m.

57.     Rollins had a drug addiction problem of which all defendants had been made aware or should have been aware.

58.     In fact, his history of out-patient and in-patient treatment for this addiction was made known to staff of the NCCC at the time of his initial screenings performed by NCCC staff (and, also, through Nassau County Drug Court documents that followed Rollins to the NCCC).

59.     Indeed, Rollins was enrolled in the Drug Alcohol Rehabilitation Treatment ("DART) program at the NCCC shortly after his admission to that facility.

60.     DART is a drug-treatment boot camp, if you will.  Clients meet for three group-therapy sessions daily, in addition to a Narcotics Anonymous meeting in the evening. They also receive individual therapy from drug-treatment counselors.

61.     Rollins had been arrested in Nassau County on a drug-related charge and entered a plea-bargained guilty plea in June, 2016, and was released on his own recognizance.  Sentencing was adjourned numerous times.

62.     Then, on March 22, 2018, Rollins was arrested in Suffolk County on a charge of operating a motor vehicle while impaired by drugs.  This arrest led to Rollins' bail being revoked in the pending Nassau County case and his being remanded to the custody of the Nassau County Sheriff, at the NCCC on April 3, 2018.

63.     During the aforesaid initial screenings, Rollins also informed NCCC staff, including NUMC and NHCC employees and agents, of his history of childhood heart disease and heart problems, which required yearly check-ups to monitor his status.

64.     Defendant Nassau County, a municipal corporation, is a political subdivision of the State of New York.  The County owns and has ultimate responsibility for the NCCC, which is operated by the NCSD, which, in turn was under the supervision of the County Sheriff, who, at all relevant times, was defendant Fludd.

65.     The defendant County had a non-delegable duty to ensure that each and every one of Rollins' constitutionally guaranteed rights were protected and enforced while he was a pre-trial detainee at the NCCC.

66.     The defendant County had a non-delegable duty to ensure that Rollins received all reasonable and necessary basic human needs, including, without limitation, health care, medical care and treatment and to be safe and protected in his person while a pre-trial detainee at the NCCC.

67.     Defendant NCCC is located in East Meadow, New York, in the Eastern District of New York.  The NCCC is operated by the NCSD pursuant to Article XX of the Nassau County Charter.

68.     NCCC is the largest county correctional facility in the State of New York. The facility has a maximum capacity of 1,916 beds, and its inmate population includes pretrial detainees, convicted prisoners serving sentences of up to one (1) year, certain federal and state prisoners in transit and inmates alternately housed in Suffolk County and New York City.

69.     Defendant NCSD is a department of the defendant County.  It is headed by a Sheriff, who is its chief supervisor and administrator.

70.     The Sheriff, among other duties, oversees the operations of the NCSD, which includes the daily operation of the NCCC and making policy decisions.

71.     The Sheriff is responsible for supervising deputy sheriffs, corrections officers and other staff, and she participates in formulating and establishing the practices, customs and policies of her department and the NCCC, as well as overseeing those practices, customs and policies.

72.     The number of corrections officers at the NCCC dropped from 1,100 in 2012 to 790 officers in 2018, the year of Rollins' death.

73.     Defendant Vera Fludd was appointed Sheriff by the chief executive officer of the County, the County Executive.  Her appointment was approved by the Nassau County Legislature.

74.     Defendant Fludd was appointed Acting Sheriff on January 1, 2018, and she was sworn in as Sheriff on March 9, 2018.

75.     Defendant Fludd was, at all relevant times herein, the Sheriff of the NCSD, succeeding Michael J. Sposato, who resigned his position under official and public pressure to do so.  Fludd had served as Sposato's Undersheriff.

76.     Sheriff Fludd, during all relevant times, maintained an office located at 100 Carman Avenue, East Meadow, County of Nassau, State of New York, which also is the address of the NCCC.

77.     Defendant NHCC, also known as NuHealth or NuHealth System, at all times pertinent hereto, was and is a public benefit corporation, duly organized and existing by and through the laws of the State of New York, with its principal facility for providing health and medical care located at 2201 Hempstead Turnpike, East Meadow, New York.  NHCC provides health and medical services, and among other health care resources, it operates NUMC.

78.     Defendant NUMC is a general medical and surgical hospital owned and operated by NHCC.  It is located at 2201 Hempstead Turnpike, East Meadow, New York 11554.

79.     NUMC and NHCC, by a May 2017 contract with the County and the NCSD, provide, and provided during the relevant time period herein, health and medical services, including treatment, for the inmates of NCCC.

80.     In 2000, the Nassau Interim Finance Authority ("NIFA") was appointed by the State of New York to oversee the defendant County's troubled finances.

81.     Since 2011, NIFA has controlled Nassau County's finances and had exempted NuHealth from "strict controls."  In February 2020, NIFA reversed its 2011 decision to exempt NUMC from NIFA's oversight and established controls over NuHealth's and NUMC's expenditures and overall financial decisions.

82.     NIFA's decision to take control was based, at least in part, by the fact that NHCC lost $193.9 million from 2015 t0 2018, and the fact that the County backs more than $188 million in NUMC's debt.

83.     Defendants "John Does 1-10" are Corrections Officers, who were or still are employees, servants and agents of the County, performing duties and services, including as supervisors, at the NCCC at the relevant times referred to in the within action.  Their names are unknown or not positively known to plaintiffs but are known to the defendants.  With respect to the acts and omissions set forth in this Complaint, the Corrections Officer defendants, including supervisory defendants, each acted under color of state law in the course of their duties and

functions as employees, servants, and/or agents of the County.

84.     Defendants "John and Jane Does 11–20" are employees, servants, agents or independent contract workers for NHCC and/or NUMC, who were or still are employees, servants, agents or independent contractors of the aforesaid entities, performing duties and services, including as supervisors, at the NCCC at the relevant times referred to in the within action.  These defendants include physicians, nurses, physician's assistants and nurse practitioners. Their names are unknown or not positively known to plaintiffs but are known to the defendants.  With respect to the acts and omissions set forth in this Complaint, the aforesaid defendants, including supervisory defendants, each acted under color of state law in the course of his or her duties and functions as an employee, servant, independent contractor and/or agent of NUMC and/or NHCC and as an agent for the County.

85.     Private physicians, nurses, physician's assistants and nurse practitioners who provide medical services to prisoners or correctional facility detainees pursuant to a contract (or sub-contract) with the municipal defendants act under color of state law.  The physicians', nurses', physician's assistants' and nurse practitioners' judgments are exercised on behalf of defendants NHCC and NUMC and on behalf of the municipal defendants and in furtherance of their obligation to provide health and medical care to the aforesaid correctional facility inmates. The said physicians, nurses, physician's assistants and nurse practitioners perform a governmental function and carry out the municipal defendants' constitutional obligation of providing health and medical care to the said inmates.

86.     Defendant County had a nondelegable duty to Rollins to ensure that

each and every one of his constitutionally guaranteed rights, including, without

limitation, his right to due process under the law, were protected and enforced while

he was a pre-trial detainee at the NCCC.

## NOTICE OF CLAIM

87.     Plaintiffs served a Notice of Claim on the County on or about March 15,

2019.

88.     A hearing was held pursuant to New York General Municipal Law

§ 50(h) on May 30, 2019.

89.     More than thirty (30) days have elapsed since the aforesaid Notice of

Claim was served on the County, and the County has failed or refused to pay or adjust

the claims.

## FACTS

90.     The County, the NCSD and the NCCC share a long and disturbing history of

neglect of their duties, obligations and responsibilities vis-à-vis the health and medical

needs and protecting the safety and general well-being of those who become inmates of

the NCCC.

91.     The failures to provide appropriate health and medical treatment and to

provide for inmate safety at the NCCC have been legion, and, all too often, inmates'

detentions become death sentences, as was the case with Rollins.

92.     The County, NCSD and the NCCC knew of and turned a blind eye to the

pattern of manifestly deficient, unprofessional, incompetent, reckless, negligent, callous

and inhumane treatment of NCCC inmates, including Rollins, with regard to health and

medical services and safety issues.

93.     It appears that although advised, warned, castigated, reprimanded and ordered by various courts and state and federal entities over the years, saving dollars held more sway than saving lives, if the lives are the lives of inmates.

94.     Even after the intense public scrutiny and a multitude of lawsuits engendered by the Armor entities fiasco, the municipal defendants have failed to mend their ways.

95.     Much the same can be said with regard to defendants NUMC and NHCC pre-June 2011 and post-2017.  They have done little to change their policies, practices and customs and to improve inmate care.

96.     The conditions leading to the death in custody of Rollins are the culmination of a long history of the County, the NCSD and the NCCC failing to protect human rights, human dignity and human life.

97.     If we look back to the 1980's, we find long lists of inmates' complaints about the lack of and the quality of health and medical care services.  In 1981, the then Nassau County Sheriff and the County entered into a consent judgment with inmate plaintiffs who filed suit complaining of conditions, including medical care services, at the NCCC.

98.     The County, NCSD and other defendants refused to comply with the terms of the consent judgment.  Throughout the 1980's, NCCC inmates brought and won a series of lawsuits arising out of the County's and NCSD's failures to comply with this consent judgment.  Judge Jon O. Newman, writing for the Second Circuit Court of Appeals, which found the County Sheriff in contempt of court, likened the conditions at the NCCC to a "Dickensian saga of prison overcrowding and bureaucratic excuse."  *Badgley v.*

*Santacroce*, 800 F.2d 33, 35 (2d Cir. 1986).

99.     Following the well-publicized death of inmate Michael Pizzuto in 1999, the United States Department of Justice ("DOJ") opened an investigation into the conditions at the NCCC.

100.     The DOJ concluded that the conditions at the NCCC rose to the level of constitutional violations due to the deliberate indifference to inmates' serious health and medical needs.

101.     More specifically, DOJ found that the NCCC failed to train and adequately supervise correctional staff, provided medical care by unlicensed and untrained staff, failed to ensure that inmates in need of routine or acute medical care were seen by medical staff in a timely manner, failed to ensure that inmates with chronic diseases receive timely and appropriate follow-up treatment or medication, failed to identify, monitor and treat communicable diseases and failed to adequately manage medication and medical records.

102.     In fact, in 2002, the United States Attorney for the Eastern District of New York and the United States Attorney General's Office filed a lawsuit alleging, among other claims, all of that which is set forth in the above paragraph.  As will be set forth, *infra*, it appears that, in reality, not much has changed since the aforesaid DOJ investigation and lawsuit, at least, with regard to the health and medical care and safety of NCCC inmates.

103.     As a result of the aforesaid court action, the United States DOJ and Nassau County entered into a consent decree ("Settlement Agreement") that directed the County and the NCCC to make significant changes to their policies and practices pertaining to,

among other things, medical and mental health care.  As a result of the said settlement, the DOJ monitored the NCCC until 2008.  Under the terms of the Settlement Agreement, the County was responsible for ensuring that NUMC, which was under contract with the County to provide health and medical services for inmates of the NCCC, complied with the terms of the said Settlement Agreement.  (The Settlement Agreement is annexed hereto, as Exhibit A, which is made a part hereof).

104.    It is particularly noted that, under the settlement, the NCCC was required to cause to be developed and/or implemented appropriate medical policies, procedures and protocols (nineteen (19) were listed specifically and without limitation), **AND**, the settlement provided, that, *"[a]t a minimum, such policies, procedures and protocols shall conform to Standards of the New York State Commission on [sic.] Correction ("NYSCOC"), all 'essential' and 85% of the 'important' policies of the National Commission on Correctional Health Care ("NCCHC") and the American Psychiatric Association Standards for Psychiatric Services In Jails and Prisons.  For purposes of this provision, 'essential' and important policies shall be those described by the NCCHC."*  (Emphasis supplied; Settlement Agreement, at II(A)(7)).

105.    On July 9, 2002, the NYSCOC, by letter of that date from its chairman, Alan J. Croce, opined that the jail's medical housing section "… continues to lack adequate facilities, equipment and medical and mental health staff to operate safely as a special housing medical and behavioral health unit."  The then Sheriff, Edward Reilly, defied and ignored the admonition from the NYSCOC.

106.    In 2009, the NYSCOC issued a report indicating that the NCCC was not in compliance with the minimum standards for a correctional facility.

107.    Addressing certain health and medical care and safety needs of inmates was part of the twenty-five (25) steps that the NYSCOC recommended that the NCCC would need to take to come into compliance with minimum standards.

108.    The NCCC never came into compliance with those minimum standards.

109.    The NYSCOC (alternatively, "Commission") is an executive branch agency established to "visit and inspect ... all institutions used for the detention of sane adults charged with or convicted of crime." (New York State Constitution, Article XVII, § 5).

110.    The organization, powers and duties of the Commission are prescribed in Article 3 of the Correction Law.  Among other things, the Commission is charged with "mak[ing] recommendations to administrators of correctional facilities for improving the administration of such correctional facilities and the delivery of services therein" and "promulgat[ing] rules and regulations establishing minimum standards for the review of the construction or improvement of correctional facilities and the care, custody, correction, treatment, supervision, discipline and other correctional programs for all persons confined in correctional facilities." (Correction Law § 45(2), (6)).

111.    While the Commission is authorized to prescribe rules and regulations governing correctional facilities, the Commission's authority to enforce such rules and regulations is highly circumscribed.

112.    Correction Law § 43 establishes a Medical Review Board within the NYSCOC.

113.    Pursuant to Correction Law § 47(1)(a), the Medical Review Board is charged, *inter alia*, with investigating and reviewing "the cause and circumstances surrounding the death of any inmate of a correctional facility."  Further, "[u]pon review

20

of the cause of death and circumstances surrounding the death of any inmate, the Board

shall submit its report thereon to the Commission and, where appropriate, make

recommendations to prevent the recurrence of such deaths to the Commission and the

administrator of the appropriate correctional facility." (§ 47(1)(d)).  Additionally, the

Medical Review Board shall "[i]nvestigate and report to the Commission on the

condition of systems for delivery of medical care to inmates of correctional facilities and,

where appropriate, recommend such changes as it shall deem necessary and proper to

improve the quality and availability of such medical care."  (§ 47(1)(e)).

114.    In 1990, the County attempted to address some of the human rights and

human life problems at the NCCC by amending the County Charter and establishing a

Nassau County Correctional Center Board of Visitor (§ 2004).  This Board of Visitor was

to have wide-ranging powers to oversee operations at the NCCC, including authority to

investigate inmate grievances, inspect the facility, examine records, create reports and

advise the Sheriff and the NCSD about changes that could improve the facility and

prevent unnecessary deaths.

115.    The County Charter's provision mandating a Board of Visitors is a non-

discretionary duty of the County.  County administration after administration failed to

appoint the seven required Board members.

116.    In 2012, the New York Civil Liberties Union brought an action on behalf

of NCCC inmates who suffered health and medical mistreatment and maltreatment

while incarcerated to compel appointment of the seven Board of Visitor members.

117.    The complaints ranged from being administered incorrect doses of

medication, to untreated broken bones and to never being examined by a physician

despite weeks of pain and hearing loss.

118.    A State Supreme Court justice ordered the appointments of Board members in March of 2013.

119.    After much delay, upon information and belief, board members were nominated rather recently, and, eventually, all seven board member appointments were confirmed by the Nassau County Legislature.

120.    Upon information and belief, the aforesaid Board of Visitor did not convene to address the health, medical and safety needs of inmates at the NCCC until 2019.

121.    Since 2010, at least eighteen (18) inmates whose deaths could have been prevented have perished while incarcerated at the NCCC.  Some of those instances are set forth below, for illustration purposes.

122.    On January 3, 2010, while incarcerated at the jail, Eamin McGinn, 32 years of age, committed suicide.  The NYSCOC reported that his was "a preventable death with inadequate provision of mental and medical health care."

123.    On October 5, 2010, Gasparino Godino, 31 years old, hanged himself while in detention at the NCCC.  The NYSCOC found that this was a preventable death had he had proper health and medical care.  Godino was a known suicide risk because of his long history of depression and drug use.

124.    On October 27, 2010, 29-year old Herve Jeanot committed suicide while incarcerated at the NCCC.  He had been convicted of first-degree murder at his third retrial.  In its report on Jeanot's death, NYSCOC noted the NCCC "does not have any procedure in place for screening inmates who have been convicted at trial or who have

received significant sentences of incarceration" for suicide risk.

125.    On January 3, 2011, Darryl Woody, 44 years of age, committed suicide. The NYSCOC found that the death of Woody "may have been prevented but for the grossly inadequate psychiatric care provided him in the jail and [NUMC] and the lack of supervision ..."  The NYSCOC further reported that Woody had a long history of mental instability and previously had attempted suicide—once before entering the facility and, again, in December 2010, while on suicide watch at the NCCC.  The Commission's report recommended investigations into the NCCC's booking, supervision and staffing procedures and into the "gross negligence and incompetence" of the two doctors who treated Woody.

126.    On June 11, 2011, Roy C. Nordstrom, age 47, died of cardiac arrest. He complained of chest pains, eventually went to the infirmary and was sent back to his cell.  He continued to complain of chest pain and difficulty breathing.  Fellow inmates became aware of the serious distress that Nordstrom was in and shouted for guards to help Nordstrom, to no avail.

127.    Nordstrom had been incarcerated for violating an order of protection and was due to be released on July 19.  On June 11, at approximately 6:00 a.m., clutching his chest, and helped along by two fellow inmates, he approached a guard's station. Nordstrom was in obvious pain, distress and had difficulty breathing.  The guard called for medical care, however, no physician was contacted by anyone.

128.    An unsupervised licensed practical nurse (LPN) diagnosed and treated Nordstrom, and he was sent back to his dorm.  While being escorted back to his cell by a corrections officer, Nordstrom, who still had severe chest pain, fell against a wall and

could not walk any further.  The officer notified medical, and Nordstrom was taken back to the infirmary.  At about 6:50 a.m., he again was sent back to his dorm.

129.    At 7:10 a.m. Nordstrom was observed on the floor, grabbing at his chest and complaining of chest pain.

130.    Eventually, at 8:05 a.m., a Nassau County Police Ambulance was dispatched and arrived at the NCCC at 8:08 a.m.  Nordstrom died shortly thereafter.

131.    The NYSCOC issued a final report on the Nordstrom case on September 18, 2012.  Nordstrom died of myocardial infarction while in the custody of the NCCC and NCSD.  The Commission, based on the investigation of the Medical Review Board, found that the death may have been prevented had Nordstrom received appropriate emergency medical care.

132.    The Commission also found that the care provided to Nordstrom was grossly incompetent and in violation of NYS Education Law, Article 139 (Nursing) in that treatment of Nordstrom constituted unprofessional conduct and that the licensed practical nurse (LPN) involved acted outside his scope of practice.

133.    The Commission found, too, that by returning Nordstrom to his dorm, the LPN abandoned his patient; Nordstrom, it was found, should have been transferred to a hospital and treated by a physician.  Failure to do this, the NYSCOC report set forth, constituted grossly inadequate and negligent medical care.

134.    The aforesaid report found, as well, that an Armor entities' registered nurse (RN) should be investigated for "gross negligence and gross incompetence for failing to recognize that Nordstrom was critically ill, displaying obvious signs of acute coronary syndrome and keeping [him] in [a] nursing triage room … without making

notification to a physician or arranging transfer for emergency hospital level care."

135.    The NYSCOC report contained "Recommendations," including that the Nassau County Executive "shall conduct an inquiry into the fitness of Armor," and regarding the Armor entities' flagrant disregard of the New York State Education Law and the Rules of the Board of Regents, the Armor entities' nursing practices and their "unlawful medical practice."

136.    The NYSCOC further found that the failure to contact a physician constituted grossly inadequate medical care.

137.    Rather than address the NYSCOC's findings and recommendations, the municipal defendants renewed the Armor entities contract two times (in 2013 and 2015), thereby ratifying and adopting Armor's policies, practices and customs.

138.    On February 24, 2012, Bartholomew Ryan hanged himself in his cell at the NCCC within twenty-four hours of his arrest.  The 32 year-old veteran of the Iraq War had been arrested for driving under the influence of drugs and speeding.

139.    Aware that Ryan had a history of mental disorders, psychiatric treatment and drug addiction, Ryan was examined by one of the Armor entities' licensed practical nurses and, subsequently, was screened by one of its physicians.

140.    Although Ryan was housed in new admission mental housing, he was not on constant supervision or suicide watch.  As a result, he had opportunity to hang himself with his bed sheets.

141.    The NYSCOC investigation into the death found the screening of Ryan to be inadequate.

142.    According to the Commission's report, the Armor entities were to conduct

a review of its procedures for medical staff.  It was also to have clinicians available during off hours.  Further, the Armor entities were to inquire into and evaluate the professional conduct of the physician who screened Ryan.

143.    The Commission also recommended that the NCSD review its procedures and improve upon them.  John Jaronczyk, the president of the Nassau County Sheriff Correction Officers Benevolent Association, said, in a public statement, that, "Medical was supposed to come and take over the scene ... and there was a disconnect then, but it wasn't on the officers, it was on the medical company."

144.    Kevin Brown was arrested on January 13, 2014, apparently, on an outstanding warrant for a minor crime and was incarcerated at the NCCC.  On February 10, 2014, Brown, age 47, was found dead in his cell.

145.    Brown's family reported that he had a history of seizures since suffering head trauma in an automobile accident 20 years ago.  He took medication to control the seizures.

146.    The NYSCOC, which investigated the death, found that Brown died of heart failure due to hypertensive cardiovascular disease and that his body was in full rigor mortis when found, indicating that Brown had not been checked on by jail personnel for some time.

147.    The NYSCOC also found that the Armor entities' care was deficient and resulted in a mismanaged mental health diagnosis, inadequate psychiatric care, undiagnosed heart problems and inadequate management of a seizure disorder.

148.    The aforesaid findings were based, in part, on Brown not being assessed by a doctor and considered for transfer to a hospital despite experiencing an earlier

seizure at the NCCC and on Brown never getting a full mental health assessment despite his suffering active hallucinations and agitated behavior upon admission to the NCCC.

149.    According to the NYSCOC, the aforesaid deficiencies were compounded by a health record that was unorganized, incomplete and illegible.

150.    The Commission concluded that, "Had Brown received proper medical care and supervision, his death may have been prevented," and it directed that Nassau County's Legislature inquire into the Armor entities' fitness to provide inmate medical services.

151.    This directive was based on the findings in the Brown case and on what the Commission termed as a pattern of failing to provide hospitalization for patients who needed it, failing to properly manage patients' chronic medical needs and failing to keep proper and organized patient records.

152.    On July 14, 2014, John P. Gleeson, a 40-year old father of two young children died while an inmate in the care and custody of the municipal defendants.  He had been arrested and charged with burglary in the third degree for allegedly taking scrap metal wire from a garage.

153.    Gleeson had a 12-year history of angioedema, a rheumatologically dangerous condition known to officials of the NCCC at the outset of his incarceration. Despite making his condition known to the municipal defendants, Gleeson was allowed to perish after the onset of an angioedema attack, an attack which had been preceded by three other angioedema attacks while he was incarcerated.  Gleeson's hands became swollen and red, then, over the course of hours, the swelling progressed to his arms, his

chest, his neck and his head.  Inmate eye-witnesses proclaimed that his head was swollen

to twice its size and that "he looked like a bullfrog" and that "anyone could see that he was

going to die."  Inmates shouted for help, but corrections officers did not respond for hours.

He was pronounced dead, upon arrival by ambulance, at the NUMC.

154.    The NYSCOC investigated Gleeson's death, and after its Medical Review

Board completed its inquiry, it issued a final report, dated September 15, 2015.  That

report set forth numerous findings, including but not limited to:  (1) Gleeson had a history

of hereditary angioedema that went unrecognized, misdiagnosed, and improperly treated

by the medical providers from the Armor entities; (2) the delivery of health care was

incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of

effective communication, and deficient medical knowledge by physicians and mid-level

clinicians; (3) this was all compounded by a health care record that was unorganized,

incomplete, and in selected sections, illegible; (4) the Armor entities, in their contracted

locations in New York State engaged in a pattern of inadequate and neglectful medical

care, bringing into question their ability to meet and provide for the health care needs of

jail inmates; and, (5) had Gleeson been provided with competent medical care in a timely

manner, been properly referred to a specialist, received a correct diagnosis and received

proper medical treatment, his death may have been prevented.

155.    In the Gleeson case, the NYSCOC further set forth a recommendation to the

Presiding Officer of the Nassau County Legislature stating that the Legislature shall

conduct an inquiry into the fitness of the Armor entities as a correctional medical care

provider in the NCCC, requiring specific attention shall be directed to the Armor entities'

pattern of failing to properly manage patients chronicled medical needs, failing to

maintain proper and organized patient records in failing to provide hospitalization for patients when clinically indicated.

156.    Upon information and belief, the Nassau County Legislature never followed the above-stated recommendation of the NYSCOC and, the fact is, the municipal defendants renewed the Armor entities' contract for health and medical services in utter disregard of inmate health and safety.

157.    Antonio Marinaccio, Jr., age 53, became "brain dead" after suffering a heart attack while incarcerated in the NCCC, in May, 2015.

158.    Marinaccio, it appears, earlier had provided medical staff at the NCCC with medical records that showed he had a pre-existing heart condition.

159.    Apparently, Armor failed to perform an EKG of Marinaccio after he complained of severe chest pains.  He was returned to his cell from the infirmary and was later found face down and unconscious.  He never regained consciousness, and, eventually, was taken off life-support.

160.    The Notice of Claim filed on behalf of the family of Marinaccio against the municipal defendants herein and Armor, alleged that Marinaccio was the victim of wrongful death, abuse, gross misconduct and medical negligence.

161.    Remarkably, as noted previously, in June, 2015, Nassau County and the NCSD again renewed their contract with the Armor entities.

162.    Upon information and belief, six more preventable inmate deaths occurred at the NCCC in 2016 alone.

163.    The foregoing deaths are not isolated phenomena.  They are merely the tip of the inmate health and medical care iceberg, a sampling.  Hundreds of complaints from

NCCC inmates about the failure to provide needed medical and mental health services are made annually.

164.    In May, 2011, Jerry Laricchiuta, president of CSEA Local 830, the union that represented NCCC medical personnel provided by NHCC and NUMC before medical services were taken over by the Armor entities, presciently stated his concern that turning over in-jail medical care to the Armor entities would not improve medical and health care at the NCCC.  He added, "*Considering all the history here*, and the suicides, and the DOJ citation, we shouldn't be looking to scale back health care, but we are." (Emphasis supplied).

165.    Inexplicably and incredibly, the municipal defendants do not seem to have learned from their pre-June 2011 experiences with NHCC and NUMC and their June 2011 to May 2017 experiences with the Armor entities.  With apparent deliberate indifference, turning a blind eye, and, perhaps, abandoning reason, they stepped back into the misguided rut that would allow a still ill-prepared NHCC and NUMC, once again, to provide for the health and medical needs of NCCC inmates.

166.    The attitude and behavior of the municipal defendants with regard to the welfare of inmates of the NCCC, as is also the case of those defendants' policies, practices and customs in the same regard, remains remarkably consistent—deliberately indifferent.

167.    The municipal defendants have not learned from or refuse to learn from their past history of deficient and inhumane inmate care.

168.    By entering into another contract with NUMC and NHCC, in May 2017, to provide inmate health and medical services, it can be said that the municipal defendants were ratifying the past constitutionally deficient conduct, policies, customs and practices

of NUMC and NHCC with regard to inmate care and, thereby, inviting the resumption and continuation of such conduct, policies, customs and practices.

169.    The long history of the municipal defendants' misfeasance, malfeasance and nonfeasance with regard to health and medical services and inmate safety at the NCCC establishes that such has become and is the policy, practice and/or custom of the municipal defendants and that such policy, practice and/or custom caused the constitutional injury to Rollins.

170.    The history of NHCC's and NUMC's misfeasance, malfeasance and nonfeasance with regard to health and medical services at the NCCC establishes that such has become and is the policy, practice and/or custom of those entities and that such policy, practice and/or custom caused the constitutional injury to Rollins.

171.    The United States Constitution requires governmental agencies and prison officials to provide all prisoners and pretrial detainees with adequate health and medical care and to provide and maintain facility conditions to protect and keep inmates safe from harm.  These inmates, by virtue of their deprivation of liberty, cannot provide such care and safety for themselves.

172.    Brian Sullivan, president of the Nassau County Correction Officers Benevolent Association, recently stated that facility-wide searches are not done often enough.  He added, "I think there's a very serious drug contraband problem in this jail and that more measures need to be taken to root it out."

173.    Sullivan said major flaws in the battle against smuggling persist.  He pointed to contraband busts involving NCCC nurses in recent years.

174.    Sullivan also alleged that there is no supervision by uniformed officers of

food preparation in the jail's kitchens (staffed by inmates) or of deliveries of foodstuffs and other items at the facility's loading docks.

175.     Sullivan further opined, "There's no security staff.  They don't open up the stuff and go through it as things are coming in.  They don't do random searches ... It's absurd."

176.     Moreover, the municipal defendants have not employed sufficiently modern and up-to-date technology to help detect and root out contraband.

177.     As previously stated herein, on or about April 3, 2018, Rollins became a detainee at the NCCC.  He had been charged with drug related offenses, which offenses stemmed from Rollins' addiction to drugs.  He was remanded to the custody of the Nassau County Sheriff by a judge of the Nassau County Drug Court, who revoked Rollins' bail, which stood for almost two years, after he was arrested in Suffolk County in March 2018, for driving under the influence of drugs.

178.     Rollins had a history of drug addiction.  The municipal defendants, and, by extension, the defendants NUMC and NHCC had actual and constructive knowledge of that addiction.

179.     Rollins' health problem, that is, the said addiction, was made known to officials at the NCCC at the outset of Rollins' incarceration at the initial screening during the admission process of April 3, 2018.  Moreover, that same day, another individual also screened Rollins, as part of a health assessment.   This second screener was an employee or agent of NHCC and NUMC.

180.     Further, Rollins' incarceration, as stated above, came by way of Nassau County's Drug Court program.  His Drug Court records followed him to the NCCC and

became part of that institution's file on Rollins. These records set out Rollins' history of drug addiction.

181. The fact is, on April 12, 2018, Rollins was assigned to the NCCC's DART program and housed in a cell block area (Housing Unit EO2-H17) specifically designated for inmates like Rollins, who had an addiction to drugs. There, such inmates could be more closely monitored, and, as well, attend scheduled therapy meetings, at least, three times daily.

182. Inexplicably, and rather suddenly, Rollins was removed from the DART program in July 2018, and he was placed in a cell block in the general inmate population. Eventually, he wound up at the EO2 CO9 area of the jail.

183. Upon information and belief, Rollins was needlessly, negligently, improperly and wrongly removed from the DART program, to his extreme detriment.

184. It has been said that the removal was at the behest of a corrections officer who disliked Rollins.

185. Such removal from the said program unnecessarily and wrongly imperiled Rollins' safety. It led to his demise.

186. Removal from DART and housing in the general population exposed Rollins to greater and all too easy access to contraband drugs, an exposure that he was not yet ready to deal with, given his being deprived of much needed therapy and support and other benefits of the DART program.

187. Eventually, housed in the general population, Rollins was given or otherwise obtained the fatal fentanyl-laced drugs through the NCCC's open pipeline to contraband drugs.

188.    Clearly, Rollins had a drug addiction problem that was ignored completely by the defendants after he was removed from the DART program.

189.    Rollins' health and medical care was ignored completely by the defendants.

190.    Rollins' safety and well-being were ignored completely by the defendants. Defendants abandoned their duty to protect him.

191.    Rollins' mother, plaintiff Susan Rollins, visited often at the NCCC and spoke with him daily by telephone.

192.    Rollins told his mother during visits and/or telephone calls of illegal drugs being available to inmates at the NCCC.  Although his mother advised against drug use, it appears that such advise was not followed—and, perhaps, could not be because of his addiction not being under control.

193.    In fact, in November 2018, two inmates in the general population of the NCCC overdosed on illegal drugs and had to be treated with Narcan by corrections officers.  There were no responsive facility-wide shutdowns and searches for contraband drugs on these occasions.

194.    On December 15, 2018, a random cell search of the first floor of the building in which Rollins was housed turned up illegal drugs.  No facility-wide or, even, housing-wide search was conducted as a responsive safety/security measure.

195.    On December 17, 2018, more illegal drugs were found on the first floor of the same building.  Still, no facility-wide or housing-wide search was conducted as a responsive safety/security measure.

196.    On December 20, 2018, more contraband was found on the first floor of the very same building.  Yet again, corrections officers failed to conduct a facility-wide or

building-wide search for more contraband.

197.    On December 24 and 26, 2018, other incidents involving contraband occurred in the same building with no building-wide or facility-wide searches being made.

198.    On January 5, 2021, the NYSCOC issued its Final Report, signed by Thomas J. Loughren, Commissioner & Chair, Medical Review Board, regarding Rollins' death.

199.    Significantly, the NYSCOC's Medical Review Board found "... that the facility [NCCC] failed to respond to a pattern of drug-related contraband within E Building during the month of December by not conducting thorough housing searches."

200.    The Report further indicates that, "The Medical Review Board finds facility policies CD 05-03-02 (Random Daily Searches) and CD 05-03-11 (Housing Area Searches) were inadequate; they failed to make clear what indicators would necessitate a full housing area search outside of routine duties.  Specifically, the policies failed to identify that contraband found during a random search is an indication that a full housing search should be conducted."

201.    On December 27, 2018, apparently at 8:40 a.m., an inmate notified a corrections officer that Rollins "did not look well."  The corrections officer allegedly notified his immediate superior corrections officer, a corporal, of this, and, then, proceeded to Rollins' cell in C-Block, cell 18.

202.    The corrections officer stated that he saw Rollins laying on the floor and, so, the officer activated his radio alarm for a medical emergency.

203.    Subsequently, the aforesaid corporal entered the cell and started "an initial assessment" of Rollins condition.

204.    A corrections officer sergeant arrived at the scene and ordered the

corporal to return to the control room and the first corrections officer on the scene to continue to secure the unit.

205.    The sergeant noted that Rollins did not appear to be breathing or to have a pulse.

206.    Then, another corrections officer arrived on the scene with health staff. Apparently, chest compressions were started, and an ambu-bag was used to assist respiration.

207.    The corrections officers did not administer Narcan to Rollins.

208.    Upon information and belief, Narcan should have been available to corrections officers for emergency use in a suspected drug overdose case.

209.    Two doses of Narcan were administered to Rollins by an NCCC staff physician after he arrived at Rollins' cell area.

210.    Notably, the NYSCOC Medical Review Board found that "…the facility health staff failed to adequately document their resuscitation efforts of Rollins due to the exclusion of times that the interventions were given."

211.    The NYSCOC required of the Nassau County Sheriff that, "[t]he Sheriff review and revise facility policies CD 05-03-02 (Random Daily Searches) and CD 05-03-11 (Housing Area Searches) to include indicators that would prompt a housing unit search to be performed outside of the routine biannual search.  Housing unit searches should be conducted when there is evidence of contraband within the facility such as an overdose."

212.    Upon information and belief, neither the Sheriff nor any of the municipal defendants revised the facility policies identified above.

213.    The NYSCOC also required that the "facility physician" (Medical Director of

the NCCC) submit a report of findings and corrective actions for improvement of resuscitation documentation.

214.    Upon information and belief, the Medical Director has not submitted a report of findings and corrective actions.

215.    Upon information and belief, Rollins' last hours of his life were of nightmarish horror and agony.

216.    The Report of Autopsy of the Office of the Medical Examiner of Nassau County, made by Deputy Medical Examiner Brian O'Reilly, M.D., dated April 3, 2019, establishes the cause of Rollins' death to be "Anoxic-ischemic encephalopathy due to acute fentanyl intoxication."

217.    The manner of death in the abovesaid report is stated to be, "Accident."

218.    The said Report, more specifically, in describing the condition of Rollins' head, notes an "Acute diffuse anoxic ischemic encephalopathy.  Cerebral edema with brain herniations."  Microscopic examination of decedent's lungs revealed "Pneumonia. Congestion."

219.    Rollins' medical condition was a serious medical condition.  He suffered sufficiently serious injury—death—as a result of the failures, deficiencies and deliberate indifference of the defendants.

220.    The defendants herein acted with deliberate indifference with regard to Rollins and with regard to his serious medical need.

221.    The denial of appropriate health and medical care created a condition of urgency and resulted, unnecessarily, in his death.

222.    The treatment of or failure to treat and the harm to Rollins was so

egregious as to rise to the level of constitutional violation.

223.    The municipal defendants and the defendants NUMC and NHCC ignored the past warnings and recommendations of the NYSCOC with regard to NCCC inmate care.

224.    Based on the well-known, long and repetitious history of systematic medical and health care and safety deficiencies and failures at the NCCC, as well as an abundance of adverse media coverage and publicity in that regard over the years, a significant number of adverse NYSCOC reports, the successful lawsuits brought against the municipal defendants in the Eastern District of New York and in Nassau Supreme Court and the many hundreds of prisoner complaints, the municipal defendants, including the unnamed Corrections Officer defendants, had actual knowledge of the deficiencies in health and medical care at the NCCC.

225.    Under the circumstances extant, the municipal defendants, including the Corrections Officer defendants, knew of the deficiencies in the medical treatment of Rollins and/or that the state of medical and health services at the NCCC could and would lead to the deadly consequence suffered by Rollins. They were, in fact, aware of facts from which the inference could be drawn that a substantial risk of serious injury or harm existed with regard to Rollins.

226.    Similarly, NUMC and NHCC had knowledge of all that is set out in the above paragraphs.

227.    The defendants further exhibited deliberate indifference by ignoring past sanctions imposed by courts and the DOJ, by allowing the systematic deficiencies of health and medical care and safety at the NCCC to "fester" for decades, by ignoring reports of the NYSCOC issued prior to that entity's report on Rollins, by ignoring Rollins' obvious

addiction condition, by failing to provide treatment for a diagnosed or known condition, by failing to investigate to make an informed judgment, by delaying or denying treatment of Rollins, by making medical decisions based on non-medical factors (for example, financial considerations, expediency, lack of staff, etc.), in interfering with access to medical treatment (by giving priority to financial considerations rather than the welfare of an inmate), by making a health and medical judgment as to Rollins that was so deficient and incompetent that it was not "medical" or reasonable, and, as to the municipal defendants only, by contracting with NUMC and NHCC without doing proper due diligence, especially and particularly in light of the municipal defendants' past experiences with NUMC's and NHCC's health and medical care services provided to inmates of the NCCC, as well as the municipal defendants' catastrophic experience with the Armor entities.

228.    The acts and omissions of the municipal defendants and their repeated conduct was so persistent and widespread, as has been set out hereinabove, as to constitute policies, customs and practices that proximately caused the constitutional injury to Rollins.

229.    The Fourteenth Amendment's due process clause governs the right of pre-trial detainees such as Rollins to be safe and protected while incarcerated.  The defendants failed to protect him.

230.    NUMC, NHCC and their doctors and other medical personnel, as a consequence of NUMC's and NHCC's contract with Nassau County to provide health and medical services to the inmates of the NCCC, and, therefore, performing governmental functions, are subject to § 1983 claims relating to the adequacy of the medical and health

services provided.

231.    NCCC officials knew that Rollins faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.

232.    The defendant Fludd and the various Corrections Officer defendants (some of whom were supervisors), through their own individual actions, violated Rollins' constitutional rights.

233.    Sheriff Fludd, as a supervisory official, participated directly in the constitutional violations.  As Sheriff and chief administrator and supervisor of the NCCC, she promulgated, created or participated in the creation of the policies, practices and customs under which the unconstitutional conduct occurred, and/or she allowed the continuance of such policy, practice and custom.

234.    Defendant Fludd knew, and/or it was obvious that continuing the above-said policies, practices and customs posed an excessive risk to the health and safety of inmates like Rollins.

235.    Defendant Fludd, through her continued encouragement, approval and ratification of the aforementioned policies, practices and customs, despite their known and obvious inadequacies and danger and risks to inmates, was deliberately indifferent to inmates,' including Rollins,' serious medical needs and safety.

236.    The municipal defendants (including Fludd) failed to adequately train and supervise the staff of the NCCC.  This constituted deliberate indifference to the rights of those inmates who would come into contact with the said staff, including Rollins.

237.    Defendants NUMC and NHCC failed to adequately train and supervise their medical staff, which staff performed health and medical care services at the NCCC.  This

constituted deliberate indifference to the rights of those inmates, including Rollins, who came into contact with the said staff.

238.    The municipal defendants endorsed, accepted and adopted the policies, practices and protocols of defendants NUMC and NHCC, and the conduct, acts and failures to act in pursuance of these policies caused the violation of Rollins' constitutional rights.

239.    In re-engaging defendants NUMC and NHCC via the contract with them in May 2017, the municipal defendants ratified the policies, practices and protocols of NUMC and NHCC, when, in fact, they should have taken affirmative and reasonable action to obtain other means for providing for inmates' health and medical needs.

240.    The municipal defendants created the risk of violating Rollins' constitutional rights by creating conditions, policies, customs and practices as those set out hereinabove.

241.    NUMC and NHCC created the risk of violating Rollins' constitutional rights by creating conditions, policies, customs and practices as those set out hereinabove.

## CLAIMS FOR RELIEF - FEDERAL

## FIRST CLAIM

242.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "241," above, as if more fully set forth herein.

243.    The defendant County, acting on its own and through the NCSD, the NCCC, Sheriff Fludd and the defendants NUMC and NHCC, directly caused the constitutional violations suffered by Rollins as a result of the pattern of conduct alleged herein of Sheriff Fludd, Corrections Officers John Does 1-10, NUMC and NHCC and their employees and agents, John and Jane Does 11-20, and is liable for damages suffered by the plaintiff

herein.

244.    At all times relevant herein, defendant County, acting on its own and through the NCSD, NCCC, Sheriff Fludd and the defendants NUMC and NHCC had in effect certain policies, practices and customs that created, caused, condoned, contributed to, allowed and fostered the unconstitutional conduct of the other municipal defendants, defendants NUMC and NHCC and the said individual corrections officers and the said employees and agents of the NUMC and NHCC.

245.    At all times relevant herein, defendant County, acting on its own and through the NCSD, NCCC, defendants NUMC and NHCC and the aforesaid individual defendants, had in effect certain policies, practices and customs which overlooked and ignored, encouraged and explicitly and/or tacitly sanctioned, through the conduct alleged herein, the violation of Rollins' and other inmate's constitutional rights to adequate health and medical care and safety at the NCCC.

246.    The aforesaid policies, practices and customs were the direct and proximate cause of the unconstitutional conduct alleged herein as to Rollins and other NCCC inmates.

247.    The defendant County knew of the deficiencies of health and medical services at the NCCC, by the defendants NUMC and NHCC and the aforesaid individual defendants, prior to December 28, 2018, the date of Rollins' death.

248.    Despite its knowledge and awareness, as aforesaid, the defendant County allowed this wrongful and unconstitutional conduct and failed to take appropriate remedial action.

249.    The defendant County knew of the NUMC's and NHCC's propensities for

and history of performing deficient health and medical services on behalf of inmates.

250.    By contracting with NUMC and NHCC in May 2017, the defendant County ratified, condoned and adopted NUMC's and NHCC's policies, practices and/or customs of NUMC's and NHCC's deficient health and medical care services.

251.    Despite its knowledge of the aforesaid propensities and history of NUMC and NHCC, the defendant County failed to take appropriate remedial action.

252.    The defendant County's conduct demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

253.    All of the foregoing led to the violation of Rollins' constitutional rights and his untimely and unnecessary death.

<u>**SECOND CLAIM**</u>

254.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "253," above, as if more fully set forth herein.

255.    The defendant County, acting on its own and through the other municipal defendants failed to train or to adequately train the defendant Corrections Officers John Does 1-10, other NCSD staff and medical staff at the NCCC.

256.    The defendant County, acting on its own and through the other municipal defendants, failed to train or to adequately train defendants NUMC and NHCC, and their employees and agents, John and Jane Does 11-20.

257.    The need for training, additional training or different training to avoid violation of constitutional rights was such as to be obvious that the inadequacy of training would result in a violation of Rollins' and other inmates' constitutional rights relating to their serious medical needs and other aspects of health and medical care and their safety.

258.    The inadequacy of training as aforesaid at the NCCC was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Rollins and other inmates and established the deficient and inappropriate training as policy, practice and/or custom.

259.    The pattern of similar constitutional violations by untrained or inadequately trained NCCC staff (including medical staff of NUMC and NHCC) demonstrates the deliberate indifference of the County toward its failure to adequately train NCCC staff.

260.    As a result of all that is set out above, the defendant County had sufficient notice of the failure to adequately train.

261.    Despite the said sufficient notice, the defendant County failed to take appropriate remedial action.

262.    It is and was reasonable for plaintiff, Rollins and other NCCC inmates to expect adequate training to have occurred.

263.    The defendant County's conduct demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

264.    All of the foregoing led to the violation of Rollins' constitutional rights and his untimely and unnecessary death.

**THIRD CLAIM**

265.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "264," above, as if more fully set forth herein.

266.    The defendant County, acting on its own and through the other municipal defendants failed to supervise or to adequately supervise the defendant Fludd, the

defendant Corrections Officers John Does 1-10, other NCSD staff and medical staff of the NCCC, including John and Jane Does 11-20.

267.    Defendant County employee supervisors, in the County government's executive branch, participated directly in the unconstitutional actions of the defendants by promulgating, creating, condoning, implementing, directing, adopting as their own and carrying out or continuing certain policies, practices and customs that violated Rollins' and other inmates' constitutional rights, as alleged hereinabove.

268.    Defendant Fludd, as a supervisor and administrator, participated directly in the unconstitutional actions of the defendants by promulgating, creating, condoning, implementing, directing, adopting as her own and carrying out certain or continuing policies, practices and customs that violated Rollins's and other inmates' constitutional rights, as alleged hereinabove.

269.    The aforesaid defendant supervisors were deliberately indifferent with regard to their supervision of others, including other defendants.

270.    The aforesaid defendant supervisors had knowledge of the inadequacies of their supervision and failed to do anything to remedy the situation that existed.

271.    The aforesaid supervisors caused Rollins to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and the laws of the United States.

272.    The conduct of the defendant County and the aforesaid supervisors demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

273.    The defendant County's and the aforesaid supervisors' failures to

adequately supervise, as set forth, led to the violation of Rollins' constitutional rights and his untimely and unnecessary death.

**FOURTH CLAIM**

274.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "273," above, as if more fully set forth herein.

275.    The defendants NUMC and NHCC failed to train or to adequately train the medical staff at the NCCC, including defendants John and Jane Does 11-20 and, further, failed to train or adequately train defendant Corrections Officers John Does 1-10.

276.    The need for training, additional training or different training to avoid violation of constitutional rights was such as to be obvious that the inadequacy of training would result in a violation of Rollins' and other inmates' constitutional rights relating to serious medical needs and other aspects of health and medical care.

277.    The inadequacy of training given by the defendants NUMC and NHCC to medical staff and corrections officers at the NCCC was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Rollins and other inmates and established the deficient and inappropriate training as policy, practice and/or custom of NUMC and NHCC.

278.    The pattern of similar constitutional violations by untrained or inadequately trained NCCC medical staff and corrections officers demonstrates the deliberate indifference of the defendants NUMC and NHCC toward their failure to adequately train the aforesaid NCCC staff.

279.    As a result of all that is set out above, defendants NUMC and NHCC had sufficient notice of the failure to adequately train.

280.    Despite the said sufficient notice, defendants NUMC and NHCC failed to take appropriate remedial action.

281.    It is and was reasonable for plaintiff, Rollins and other NCCC inmates to expect adequate training to have occurred.

282.    Defendants NUMC's and NHCC's conduct demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

283.    All of the foregoing led to the violation of Rollins' constitutional rights and his untimely and unnecessary death.

### FIFTH CLAIM

284.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "283," above, as if more fully set forth herein.

285.    Defendants NUMC and NHCC failed to supervise or to adequately supervise the defendant medical staff of the NCCC, including defendants John and Jane Does 11-20 and, further, failed to train or adequately train defendant Corrections Officers John Does 1-10.

286.    Supervisors and administrators employed by defendants NUMC and NHCC participated directly in the unconstitutional actions of other defendants by promulgating, creating, condoning, implementing, directing, adopting as their own and carrying out or continuing certain policies, practices and customs that violated Rollins' and other inmates' constitutional rights, as alleged hereinabove.

287.    The aforesaid defendant supervisors and administrators were deliberately indifferent with regard to their supervision of others, including other defendants.

288.    The aforesaid defendant supervisors and administrators had knowledge of

the inadequacies of their supervision and failed to do anything to remedy the situation that existed.

289.    The aforesaid supervisors caused Rollins to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

290.    The conduct of defendants NUMC and NHCC and the aforesaid supervisors and administrators demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

291.    Defendants NUMC's and NHCC's supervisors' and administrators' failures to adequately supervise, as set forth, led to the violation of Rollins' constitutional rights and to his untimely and unnecessary death.

## SIXTH CLAIM

292.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "291," above, as if more fully set forth herein.

293.    The defendants had an affirmative duty to provide and administer health and medical services to Rollins and other NCCC inmates.

294.    The defendants, as previously alleged, had a duty and obligation to Rollins and other inmates of the NCCC to provide reasonable and adequate health and medical services.

295.    The defendants had knowledge that the health care they provided and/or were responsible for providing to Rollins and other inmates of the NCCC was deficient, inadequate and incompetent.

296.    The health and medical care provided by defendants, or which they were

responsible for providing, to Rollins failed to meet an acceptable standard of treatment and care in terms of modern medicine, technology, human health and current beliefs about human decency.

297.    The health and medical care provided by the defendants, or which they were responsible for providing, created an excessive risk to Rollins, and the harm to which Rollins was exposed was sufficiently serious as to implicate his constitutional rights.

298.    The defendants knew that Rollins' medical condition constituted a serious need for competent and adequate medical care and treatment.

299.    The defendants knew of and ignored the aforesaid excessive risk to Rollins' health.

300.    The denial of adequate medical care as aforesaid created a condition of urgency, where pain, emotional distress, disability, permanent injury or death was likely.

301.    The defendants' policies, practices, customs, actions and failures to act constituted deliberate indifference to the serious medical needs of Rollins.

302.    The defendants had a duty to provide for Rollins' safety and to protect him.

303.    The defendants' protection of Rollins was deficient, inadequate and incompetent and failed to meet acceptable standards of a civilized society.

304.    The defendants knew of and ignored their duty to protect Rollins.

305.    The defendants' policies, practices, customs, actions and failures to act constituted deliberate indifference to the serious needs of Rollins to be protected.

306.    The denial of or failure to adequately protect Rollins created a condition of urgency, where pain, emotional distress, disability, permanent injury or death was likely.

307.     As a direct and proximate result of the foregoing, Rollins was subjected to great physical and emotional pain and suffering.

308.     The defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

309.     As a direct and proximate result of the foregoing, Rollins was denied due process.

310.     As a direct and proximate result of all of the foregoing, as alleged hereinabove, Rollins' rights under the Fourteenth Amendment of the United States Constitution were violated, which violations resulted in his death.

<u>**SEVENTH CLAIM**</u>

311.     Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "310," above, as if more fully set forth herein.

312.     Defendants NUMC and NHCC were under contact with the defendant County to provide constitutionally adequate health and medical care services for the inmates of the NCCC.

313.     Defendants NUMC and NHCC, including their doctors, nurses, physician's assistants and nurse practitioners, some of whom are defendants John and Jane Does 11-20, made numerous mistakes in the care and treatment of Rollins.

314.     Defendants NUMC and NHCC, including their doctors, nurses, physician's assistants and nurse practitioners, some of whom are defendants John and Jane Does 11-20, were negligent in the care and treatment of Rollins.

315.     Defendants NUMC and NHCC, including their doctors, nurses, physician's assistants and nurse practitioners, some of whom are defendants John and Jane Does 11-

20, failed to provide constitutionally adequate health and medical care to Rollins.

316.    As a direct and proximate result of the foregoing Rollins was subjected to great physical and emotional pain and suffering.

317.    The conduct of defendants NUMC and NHCC, including of the aforesaid doctors, nurses, physician's assistants and nurse practitioners, demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

318.    All of the foregoing led to the violation of Rollins' constitutional rights and his untimely and unnecessary death.

**EIGHTH CLAIM**

319.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "318," above, as if more fully set forth herein.

320.    Unknown corrections officers, designated herein as Corrections Officers John Does 1-10, were deliberately indifferent to the serious medical needs of Rollins.

321.    These serious medical needs were known by and/or obvious to the said corrections officers.

322.    These defendant corrections officers failed to keep watch and/or properly monitor Rollins, a known drug addict.

323.    These corrections officers failed to prevent contraband narcotic drugs from entering the everyday commerce at the NCCC, or, at least, to "stem the tide" or significantly reduce the flow of illegal drugs, to the extreme detriment of Rollins.

324.    These corrections officers failed to protect Rollins.

325.    These defendant corrections officers delayed Rollins' receiving medical care and treatment for his drug addiction on occasions prior to his death on December 28,

2018.

326.    On December 27, 2018, these defendant corrections officers wasted valuable time in Narcan being administered to Rollins and in getting Rollins to emergency medical care and treatment that he obviously needed after suffering an overdose of drugs.

327.    As a direct and proximate result of the deliberate indifference of the said corrections officer defendants, Rollins suffered unnecessary, prolonged and exacerbated mental and physical pain and suffering.

328.    As a direct and proximate result of the deliberate indifference of the corrections officer defendants, Rollins' chances of surviving the drug overdose were severely diminished.

329.    The defendant corrections officers' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

330.    All of the foregoing led to the violation of Rollins' constitutional rights and his untimely and unnecessary death.

**NINTH CLAIM**

331.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "330," above, as if more fully set forth herein.

332.    The purpose and policies underlying 42 United States Code § 1983 are compensation for those whose constitutional rights are violated as a result of actions taken under color of state law and deterrence by punishing those who have caused the constitutional violations.

333.    New York law regarding wrongful death and survival actions and recoverable damages is inconsistent with the purpose and policies of § 1983, in that such

state statutes would bar or limit available remedies under § 1983.

334.     As set forth hereinabove, defendants' wrongful conduct, policies, customs and practices with regard to health and medical services at the NCCC were the direct and proximate cause of Rollins' death.

335.     As a direct and proximate result of the aforesaid wrongful conduct, policies, customs and practices, Rollins was deprived of his enjoyment of life.

336.     As a direct and proximate result of the aforesaid wrongful conduct, policies, customs and practices, Rollins suffered great physical pain, severe emotional distress, terror and mental anguish and loss of health prior to his death.

337.     As a direct and proximate result of the aforesaid wrongful conduct, policies, customs and practices, Rollins suffered the illegal deprivation of his constitutional entitlements.

338.     The defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Rollins.

339.     All of the foregoing led to the violation of Rollins' constitutional rights and his untimely and unnecessary death.

## CLAIMS FOR RELIEF – STATE

## TENTH CLAIM

340.     Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "339," above, as if more fully set forth herein.

341.     By reason of all that is set forth hereinabove, including the wrongful conduct, acts and omissions of the defendants, Rollins sustained severe bodily injury resulting in his death on December 28, 2018.

342.     Rollins is survived by his mother and other potential distributees.

343.     As a result of the wrongful death of Rollins, his next of kin and distributees lost his services, companionship, support, care, physical, moral and intellectual guidance, income and expected inheritance.

344.     Rollins' estate is entitled to receive compensation for his pain and suffering.

345.     As a result of the foregoing wrongful death of Rollins, his estate became liable for and expended sums of money for funeral, burial and other expenses.

346.     As a result of the foregoing wrongful death of Rollins his next of kin and distributees suffered pecuniary loss as defined in the laws of the State of New York, including the New York Estates, Powers and Trust Law.

347.     The wrongful conduct, acts, omissions, policies, customs and practices of the defendants, as described hereinabove, were so egregious as to entitle Rollins' estate to punitive damages.

## ELEVENTH CLAIM

348.     Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "347," above, as if more fully set forth herein.

349.     The municipal defendants and defendants NUMC and NHCC are vicariously liable for the acts of their employees and/or agents under the doctrine of *respondeat superior*.

350.     The municipal defendants and defendants NUMC and NHCC, through their employees and/or agents owed a duty to Rollins and all other inmates incarcerated at the NCCC, to tender medical care and treatment with reasonable care and not to cause

additional harm during the course of that care and treatment.

351.    Defendants John and Jane Does 11-20 are physicians, nurses and other medical personnel who are employees and/or agents of the defendants NUMC and NHCC and agents of the defendant County and whose identities are unknown to plaintiffs at this time, but whose identities are known to the defendants herein.

352.    During his incarceration at the NCCC, Rollins was seen, treated by or had consulted with various of the unknown defendant doctors, nurses, physician's assistants and nurse practitioners.

353.    Defendants NUMC and NHCC held themselves out to be providers of professional, competent and skilled health and medical care services.

354.    Upon information and belief, at all times material herein, certain defendants John and Jane Does 11-20 held themselves out to be physicians, nurses and other medical personnel licensed to practice in the State of New York and/or elsewhere.

355.    John or Jane Doe physicians held themselves out to be competent to diagnose, treat, prescribe medications for and otherwise tend to inmates of the NCCC like Rollins.

356.    During Rollins' incarceration at the NCCC, certain of the aforesaid defendant physicians, nurses and other licensed medical personnel treated Rollins in a medically negligent manner or failed to treat him, including on the day before and the date of his death.

357.    The defendants John and Jane Does 11-20, individually, and/or jointly and severally, carelessly and negligently failed to diagnose and/or misdiagnosed Rollins' serious medical condition.

358.    The defendants John and Jane Does 11-20, individually, and/or jointly and severally, carelessly and negligently rendered medical care and treatment to Rollins, which care and treatment was not in accordance with good and accepted medical practice.

359.    The defendants John and Jane Does 11-20, individually, and/or jointly and severally, carelessly and negligently rendered improper medical care and treatment to Rollins while he was incarcerated at the NCCC.

360.    The defendants John and Jane Does 11-20, individually, and/or jointly and severally, carelessly and negligently failed to care for and medically treat Rollins.

361.    The aforesaid unknown attending defendant physicians, nurses, physician's assistants and nurse practitioners, individually and/or jointly and severally, failed to provide adequate or timely evaluation and treatment of Rollins' known condition prior to the date of his death.

362.    The defendants John and Jane Does 11-20, individually, and/or jointly and severally, carelessly and negligently failed to adequately prescribe appropriate medications to treat Rollins' medical condition.

363.    The defendants John and Jane Does 11-20, individually, and/or jointly and severally, carelessly and negligently failed to foresee a problem with the particular course of treatment administered to Rollins.

364.    The defendants John and Jane Does 11-20, individually, and/or jointly and severally, carelessly and negligently failed to monitor Rollins during his stay at the NCCC.

365.    The aforesaid unknown attending defendant physicians, nurses, physician's assistants and nurse practitioners, individually and/or jointly and severally, failed to provide adequate or timely evaluation and treatment on December 27 and on

December 28, 2018, the date of his death, even as Rollins' condition obviously deteriorated.

366.    By reason of the above, Rollins was caused to sustain severe and irreparable injury and great physical and mental pain and suffering before his death.

367.    Defendants' medical negligence was a direct and proximate cause of Rollins' death.

## TWELVETH CLAIM

368.    Plaintiff repeats, realleges and incorporates by reference paragraphs "1" through "367," above, as if more fully set forth herein.

369.    The foregoing conduct, acts, omissions, policies, customs and practices, as set forth in detail hereinabove, undertaken with such callousness, recklessness, deliberate indifference, wanton willfulness and utter disregard for human sensitivities and rights, constitutes extreme and outrageous conduct that is so egregious as to exceed the bounds of civilized behavior and shocks the conscience.

370.    The foregoing, as set forth above, was substantially certain to cause, and did cause, the plaintiff herein to suffer extreme and enduring mental anguish, shock, degradation and enduring physical pain, which was and is the direct result of defendants' intentional infliction of emotional distress.

371.    In the alternative, the foregoing, as set forth above, was substantially certain to cause, and did cause, the plaintiff herein to suffer extreme and enduring mental anguish, shock, degradation and enduring physical pain, which was and is the direct result of defendants' negligent infliction of emotional distress.

## JURY TRIAL DEMANDED

372.    Plaintiff demands a trial by jury on each and every claim for relief set forth herein.

**WHEREFORE,** plaintiff demands the following relief jointly and severally against all of the defendants, as follows:

a.      Awarding compensatory damages as to all claims for relief, except the Tenth Claim, in an amount not less than $10,000,000.00, to be proved at trial;

b.      Awarding punitive damages as to all claims for relief in an amount not less than $10,000,000.00, to be proved at trial;

c.      As to the Tenth Claim, awarding pecuniary damages and other relief in accordance with the NYEPTL;

d.      Awarding costs, including reasonable attorney's fees;

e.      Declaring that the findings of the final NYSCOC report relating to its investigation of Rollins' death are valid and that the said findings be held to be binding upon the municipal defendants and defendants NUMC and NHCC;

f.      Directing that the municipal defendants and defendants NUMC and NHCC follow the recommendations of the NYSCOC, as set forth in its final report relating to its investigation of Rollins' death;

g.      Enjoining the defendant County from entering into any contract with any entity to provide health and medical services to inmates at the NCCC without first putting such contract out to open bid and without first exercising appropriate due diligence in the selection of the service provider; and

h.      Awarding such other and further relief as this Court may deem just and

proper.

Dated:  Mineola, New York
        January 31, 2022


                    THE PASCARELLA LAW FIRM, PLLC

                    By:
                        JAMES A. PASCARELLA (JP4952)
                        *Attorneys for Plaintiffs*
                        1551 Franklin Avenue
                        Mineola New York 11501
                        Tel. No. (516) 742-1134
                        Fax No.  (516) 742-1134; 742-1137
                        Email:  Pascarellaw@optonline.net;
                                jamesapascarella@pascarellalawfirm.com

## **VERIFICATION**

**STATE OF NEW YORK   )**
                                        **)**
**COUNTY OF NASSAU   ) ss:**

SUSAN ROLLINS, being duly sworn, deposes and says:

1. I am the named plaintiff in the above action and, as such, am fully familiar with the facts and circumstances set forth herein.

2. I have read the foregoing Complaint and know the contents thereof.

3. The same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

SUSAN ROLLINS, Individually and
as Administrator of the Estate of
Kevin J. Rollins, Deceased

Sworn to before me this $\underline{8^{th}}$ day
of February, 2022

Notary Public

PHILIP A. AUSTIN
Notary Public - State of New York
No. 01AU6423296
Qualified in Queens County
My Commission Expires October 12, 2025

# Exhibit A

# Settlement Agreement

UNITED STATES OF AMERICA, Plaintiff,

   -against-

NASSAU COUNTY, THOMAS GULOTTA,
Nassau County Executive, NASSAU
COUNTY SHERIFF'S DEPARTMENT, and
EDWARD REILLY, Sheriff of Nassau
County, Defendants.

## I.  Introduction

1.   On April 19, 1999, the United States, through the Department of Justice ("DOJ") notified Nassau County Executive Thomas Gulotta of its intent to investigate certain conditions at the Nassau County Correctional Center ("NCCC") to determine whether those conditions violated inmates' constitutional rights. The United States conducted this investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. ï½§ï½§ 1997 *et seq.*, and the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. ï½§ 14141.

2.   On September 11, 2000, DOJ issued its letter of findings ("Findings Letter") containing evidence that NCCC subjects inmates to unconstitutional conditions that have caused them grievous harm: that staff engage in a pattern or practice of physical abuse of inmates, and that NCCC is deliberately indifferent to inmates' serious medical needs.

3.   NCCC cooperated throughout the course of the investigation and indicated a willingness to voluntarily undertake measures to improve conditions at NCCC and to respond to the evidence set forth in DOJ's Findings Letter and to address DOJ's concerns regarding treatment of inmates' serious mental health needs set forth in a letter dated October 4, 2000. Consequently, the parties enter into this Settlement Agreement for the purpose of avoiding the risks and burdens of litigation.

4.   The parties agree that this settlement does not constitute an admission by the defendants of the truth of the findings contained in the Findings Letter and does not constitute an admission of liability by the defendants. This settlement is not intended to interfere with rights conferred by any applicable collective bargaining agreements or alter any existing collective bargaining agreements.

5.   The parties acknowledge that the Nassau University Medical Center ("NUMC") provides medical care to inmates at the NCCC and that such care is provided pursuant to a contract with the NUMC which sets forth the terms and conditions of the relationship between the County of Nassau and its agencies and NUMC. Nassau County shall be responsible for ensuring that NUMC complies with the terms of this agreement. Nothing in this paragraph shall abrogate Nassau County's responsibility to comply fully with the terms of this agreement.

6.   It is expressly understood and acknowledged that, while this agreement makes no distinctions between those issues concerning inmate care, custody and control previously modified and or improved

prior to the issuance of the Findings Letter and those which shall be modified and/or improved by virtue of the terms of this agreement, the parties acknowledge that a number of the policies and/or procedures which this agreement addresses were implemented or in the process of being implemented prior to the issuance of the Findings Letter.

## II.  Medical and Mental Health Care

### A.  Policies and Procedures

7.   NCCC shall cause to be developed and/or implemented appropriate written medical policies, procedures, and protocols that include, but are not limited to the following: (1) initial inmate screening and inmate health assessments; (2) staffing levels, necessary credentials and job descriptions; (3) sick call and other access to medical services; (4) distribution and management of medications; (5) emergency care; (6) dental care; (7) mental health care; (8) substance abuse treatment; (9) treatment of individuals with special needs; (10) communicable disease testing and control; (11) women's health care; (12) routine and chronic disease care; (13) medical records; (14) staff training; (15) quality assurance; (16) mortality reviews; (17) inmate education; (18) medical safety and sanitation; (19) suicide prevention; (20) immunization; and (21) medical grievance procedures. At a minimum, such policies, procedures and protocols shall conform to Standards of the New York State Commission on Correction ("NYSCOC"), all "essential" and 85% of the "important" policies of the National Commission on Correctional Health Care ("NCCHC") and the American Psychiatric Association Standards for Psychiatric Services in Jail and Prisons. For purposes of this provision, "essential" and "important" policies shall be those so described by the NCCHC.

### B.  Medical Staffing and Professional Credentials

8.   All persons providing medical, dental or mental health treatment ("medical staff") shall have written job descriptions and shall meet applicable state licensure and/or certification requirements. For purposes of this agreement, medical staff shall be defined as physicians and "allied health professionals." For purposes of this agreement, "allied health professional" shall be defined only as a licensed physician assistant or licensed nurse practitioner. "Clinical staff" shall be defined as nursing staff and medical staff.

9.   All security personnel shall be trained to provide first response assistance in an emergency situation (i.e., CPR, bag valve resuscitation and/or to address serious bleeding.) Security personnel and Emergency Technicians ("EMTs") and Advanced Medical Technicians ("AMTs") shall not provide medical, dental or mental health, evaluation, diagnosis, or treatment, other than as first line emergency medical response. Security personnel may assist a physician or allied health professional in emergencies. Emergencies shall not include situations in which non-emergent medical, dental or mental health care treatment is necessary or is being provided, and medical staff is unavailable to provide such treatment.

10.   NCCC shall make reasonable efforts to ensure an inmate's privacy subject to legitimate security concerns and emergency situations.

11.   The medical director of the NCCC shall be a qualified, licensed physician. Qualified, licensed physicians shall supervise inmate medical and mental health treatment, and medical policy development. The medical director of the NCCC shall have ultimate responsibility for supervising all medical and clinical staff, although nursing personnel may be responsible for intermediate levels of supervision over such staff. The medical director's office shall be situated in the medical unit of the NCCC. The medical director shall routinely and regularly provide on-site supervision of medical staff. The medical director may also maintain an office at the NUMC.

12.   NCCC shall cause its medical provider to verify medical credentials for all medical professionals upon initial hire, and at least every two years thereafter. The verification shall include inquiry into any restrictions or sanctions for each health professional who provides medical care to patients. NUMC shall maintain copies of current professional credential licensing for all medical and mental health professionals, and maintain appropriate records of its credential verifications. NUMC shall make such records available to DOJ upon request.

13.   NCCC shall provide twenty-four (24) hour on site full-time physician or allied health professional coverage (under the supervision of a physician) seven (7) days per week, fifty-two (52) weeks per year. NCCC shall provide daily nursing coverage from six (6) a.m. to ten (10) p.m. NCCC shall provide a minimum of forty (40) hours of on site physician coverage (available to see patients) per week, and shall also provide and maintain twenty-four (24) hour daily on-call physician coverage. Staffing levels shall be sufficient to provide adequate treatment of inmates' serious medical needs.

14.   NCCC shall ensure that NUMC retains psychiatrists and psychiatric social workers at staffing levels sufficient to provide adequate treatment of inmates' serious mental health needs.

15.   NCCC shall ensure that NUMC maintains monthly reports setting forth all medical staffing positions filled and unfilled on the first day of each reporting period. This report shall include all personnel/professional job classifications, as defined above.

### C.   Intake Screening

16.   NCCC shall perform timely initial health screening for new inmates on the day of arrival in accordance with 22 N.Y.C.R.R. ï½§ 7010.2 and shall make every good faith effort to record and seek the inmates' cooperation to provide (1) medical, surgical, mental health, and dental history; (2) current injuries, illnesses, evidence of trauma, and vital signs; (3) current medications; (4) allergy information; (5) personal physician(s), dentist(s), and mental health provider(s); (6) immunization history as follows: influenza; pneumococcal vaccine for inmates fifty (50) or over or with chronic disease; hepatitis; (7) mental health screening to include suicide attempt history, history of mental health including hospitalization, suicidal ideation and risk assessment; (8) history of substance abuse and treatment; (9) pregnancy; (10) history or symptoms of tuberculosis, including the date and result of the last TB test; (11) history or symptoms of other communicable diseases. All medical and mental health screening forms shall become part of an inmate's medical record or chart.

17.   As part of intake screening, NCCC shall routinely perform on all inmates a tuberculin skin test (i.e. Mantoux "PPD") and shall read the PPD forty-eight (48) to seventy-two (72) hours after placement unless such test is unnecessary (i.e. history of prior positive tests) or medically contra-indicated according to Centers for Disease Control ("CDC") Guidelines. Within 72 hours of determining that an inmate's PPD test is positive, NCCC shall perform and interpret a chest x-ray of the inmate. NCCC shall follow CDC guidelines for management of inmates with TB infection, including prophylactic medication for any patient with an anticipated length of stay of two (2) months or more. Inmates who refuse a TB test shall be placed in segregation.

18.   As part of intake screening, NCCC shall routinely screen women inmates for gonorrhea and chlamydia within twenty-four (24) hours of admission, Monday through Friday and within forty-eight (48) hours if the inmate is admitted to NCCC on Saturday or Sunday. NCCC shall provide medically appropriate treatment within ninety-six (96) hours of testing. Screening shall consist of a urine screening test or bacterial culture test.

19.   As part of intake screening, NCCC shall routinely administer to all inmates a blood test for syphilis and shall provide medically appropriate treatment within ninety-six (96) hours of testing.

20.   Pneumococcal and influenza vaccinations shall be provided to inmates in accordance with CDC guidelines, unless NCCC's physician deems such vaccinations medically inappropriate, in which case, such determination shall be recorded with specificity in the inmate's chart.

21.   Inmates with Hepatitis C shall be treated in accordance with CDC guidelines, unless NCCC's physician deems such treatment medically inappropriate, in which case, such determination shall be recorded with specificity in the inmate's chart.

22.   In the event an inmate refuses to voluntarily cooperate in the screening and/or test(s) referred to in paragraphs 17-21, after being advised of its importance to the inmate's health needs, then such refusal shall be documented by medical center personnel. In such event, NCCC shall take steps medically appropriate for the health of the individual inmate, other inmates and staff.

23.   A physician or allied health professional shall perform full health assessments within seven (7) days of an inmate's arrival at NCCC, unless the intake screening indicates the inmate has a contagious illness, is on medication, has immediate medical needs, is intoxicated, is experiencing alcohol or drug withdrawal, or has been participating in a substance abuse or detoxification program, in which case, the provisions of paragraph 24 shall govern.

24.   When the initial health screening indicates that the inmate has a contagious illness, is on medication, has immediate health needs, is intoxicated, is experiencing alcohol or drug withdrawal, or has been participating in a substance abuse or detoxification program, NCCC shall conduct a full health assessment within thirty-six (36) hours of the inmate's arrival, and shall provide treatment consistent with the terms of this Agreement, except that assessment and treatment shall be provided more expeditiously if necessary for the inmate's health and safety. NCCC shall continue the same or comparable medication within twenty-four (24) hours unless it is deemed not medically indicated by NUMC physician staff or not consistent with standard medical practice after diligent efforts are made, and documented, to contact the inmate's treating physician.

25.   NCCC shall ensure that the NUMC keeps records, by month, of the number of health assessments performed on new inmates and whether the assessments were performed in a timely or untimely manner.

**D.  Sick call**

26.   NCCC shall provide sick call five (5) days a week by the clinical staff. NCCC shall ensure that a licensed physician is on call twenty-four (24) hours a day, seven (7) days a week, for immediate access by allied health professionals. Nurses shall be guided by physician approved nursing protocols.

27.  NCCC shall develop and implement written sick call policies, procedures, and practices which shall include, at a minimum, the following: (1) written sick call request slips available in English and Spanish; (2) a confidential collection method in which the request slips go directly to the medical personnel; (3) a logging procedure to record each request for sick call services, the date the inmate was seen, and the disposition (e.g., referral; whether inmate seen at sick call) of the sick call visit; (4) procedures and policies that ensure that all sick call requests are evaluated by clinical staff within 24 hours; (5) procedures and policies that ensure that medical evaluation and treatment occurs in a manner that is timely for the medical complaint; (6) procedures and practices which ensure that illiterate inmates

can orally access the sick call system by requesting access through staff, who must, as soon as reasonably possible after the oral request, fill out a request slip for the inmate; (7) procedures and practices which ensure that inmates with visual impairments, who are blind, or who have physical or cognitive disabilities which impair their abilities to complete sick call slips, can orally access the sick call system by requesting access through staff, who must, as soon as reasonably possible after the oral request, fill out a request slip for the inmate; (8) procedures and practices which ensure that all inmates, irrespective of primary language, can access the sick call system; (9) procedures and practices which ensure that results of the sick call visit are recorded in the inmate's medical record consistent with the provisions of this Agreement; (10) procedures and practices which ensure timely referrals, follow-up and provision of medication; (11) procedures which ensure timely receipt of mental health services by inmates requesting such services through the sick call process; and (12) staff training regarding these procedures and policies.

28.   No inmate shall be disciplined for or otherwise be discouraged from accessing the health care delivery system.

29.   At least three (3) times a week, documented rounds will be conducted in segregation. Inmates submitting sick call requests in segregation shall access the sick call system and be seen by qualified medical professionals in accordance with the policies and procedures developed and implemented pursuant to paragraph 27.

**E.  Chronic Diseases**

30.   NCCC shall develop and implement a written chronic care disease management program. As part of this program, NCCC shall maintain an updated chronic disease registry of inmates suffering from chronic illnesses, including, but not limited to, the following conditions: asthma, cardiac disease, elevated lipids, diabetes, HIV infection, hypertension, and seizure disorder.

31.   NCCC shall develop and implement a written updated chronic disease treatment guidelines consistent with nationally accepted guidelines for the diseases, in order to provide appropriate treatment for chronic illnesses, including routine tests, examinations, follow-up, treatment plans and continuity and coordination of care.

32.   NCCC shall keep records of all care, including

routine tests and examinations provided to inmates suffering from chronic illnesses. Such records shall be maintained in the inmate's individual file.

**F.  Medication Management**

33.   NCCC shall develop and implement written policies and procedures to ensure appropriate delivery and continuity of medication. Such procedures shall include timely distribution of medication to inmates who have visits or are out to court; procedures that ensure access to medication in emergencies and on weekends; contemporaneous documentation and monitoring of dosages dispensed and received and documentation of refusals and no-shows; and procedures that ensure that medication errors are recorded and monitored.

34.   Only trained and qualified medical staff shall administer medications. NCCC shall provide pharmaceutical staffing and coverage sufficient to address inmates' serious medical and mental health needs.

35.   NCCC shall develop and implement written policies and procedures providing for patient-specific medication administration records. Such procedures shall include filing of medication administration records in the inmate's medical record. NCCC shall develop and implement written policies and procedures regarding inmates' refusal to take or receive medication. These policies and procedures shall include counseling inmates regarding the value of the proffered medication, documenting such counseling, and recording the basis for the inmate's refusal.

36.   NCCC shall implement an automated drug profile system which shall, for example, identify adverse interactions between medications and duplication of therapeutic categories.

37.   Upon inmates' release from detention, NCCC shall offer inmates the opportunity to be provided with (1) a seven (7) day supply of appropriate medication for inmates suffering from HIV; (2) a five (5) day supply of psychotropic medication to inmates receiving such medication while incarcerated; and (3) prescriptions for appropriate medication (other than those referred to in (1) and (2), in sufficient quantities to inmates. Upon inmates' release from detention, Nassau County shall continue to provide inmates with TB with prescription medication and treatment in conformity with recognized standards and protocols applicable to TB prevention and treatment. For purposes of this provision, the number of days shall commence beginning with the day the inmate is released from detention. NCCC shall develop and implement written policies and procedures which facilitate continuity of medication upon release, including, but not limited to assisting inmates with accessing public health benefits and services. Nassau County may seek to recover from individuals with private medical coverage or medical insurance the costs of medication provided pursuant to this provision.

## G.  Medical Records

38.   NCCC shall develop and implement written policies and procedures for maintaining unified and collaborative health records. Such procedures shall include maintenance of a single medical record for each inmate covering all admissions to NCCC, inclusion of current notes from all health care providers, and all medication administration records. All medical records, including laboratory reports, etc., shall be timely filed (i.e., within three (3) days of review, creation, or use).

39.   Medical records shall be separate from the inmate's institutional record. Access to individual inmate medical records shall be restricted to medical personnel and to the legal section of the jail and the County when necessary to respond to formal complaints of failure to provide medical care or those alleging injury due to excessive force. Medical information shall be shared with NCCC officers only when the director of the medical unit or the Sheriff or his designee or the Deputy Undersheriff in charge of investigations believes sharing of this information is necessary for the health, safety or security of the institution, staff and inmates. NCCC staff shall be prohibited from divulging inmate medical information to other inmates.

## H.  Treatment of Female Inmates

40.   NCCC shall develop and implement written guidelines for medical care for women, including routine screening for pregnancy, timely screening for sexually transmitted disease, HIV counseling and testing and routine gynecological and obstetric care. NCCC shall write and follow treatment plans for pregnant women, which shall include discharge planning.

## I.  Drug and Alcohol Treatment

41.   NCCC shall develop written policies and procedures establishing a medical detoxification

process.

42.   Inmates with co-existing disorders shall be permitted to participate in NCCC's substance abuse treatment programs. Exclusion from participation shall be made on a case by case basis.

43.   Subject to approval by the New York State Office of Alcohol and Substance Abuse Services ("OASAS"), NCCC shall discontinue its current policy and practice of excluding pre-sentence inmates charged with certain crimes from participating in its substance abuse treatment programs. Exclusion from participation shall be made on a case by case basis.

44.   NCCC shall use its best efforts to expand the size of its Drug, Alcohol, Rehabilitation Treatment ("DART") and "Stop DWI" programs to accommodate additional participation.

45.   NCCC shall maintain waiting lists for its substance treatment programs and shall document the number of individuals requesting, receiving, and denied such treatment.

### J.   Mental Health Treatment and Special Needs

46.   NCCC shall develop and implement treatment plans for inmates with special needs, such as the frail elderly, and inmates with mental illness, disabilities, communicable diseases, or terminal illness. Treatment plans shall include discharge planning.

47.   NCCC shall develop and implement written policies and procedures to ensure that inmates requesting mental health services, inmates who become suicidal and inmates who develop serious mental illness while incarcerated are evaluated and treated timely, irrespective of the manner in which the services are requested. A sufficient number of hospital beds shall be available for acute mental health inmates who are determined by medical staff to require hospitalization. Mental health staff shall be provided with up to date housing lists of inmates to ensure continuity of care. Inmates with positive suicide screens shall be provided with active supervision and shall be timely seen and evaluated by mental health staff.

48.   Community based volunteers shall conduct regular community meetings for inmates in mental health units similar to those provided in NCCC's drug treatment programs.

### K.   Mortality Reviews

49.   NCCC shall cause to be performed an autopsy for every inmate who dies while in the custody of NCCC, as required by New York State law. NCCC shall cause to be performed a mortality review for every inmate who dies while in the custody of NCCC as part of the NCCC's quality improvement program.

50.   Mortality reviews shall involve physicians, nurses, and other relevant NCCC personnel (as appropriate) and shall seek to determine whether there was a pattern of symptoms which might have resulted in earlier diagnosis and intervention. All autopsy reports and related medical data shall be provided to SBI. SBI and security staff shall fully cooperate with the New York State Commission of Correction reporting requirement under 9 NYCRR ï½§ 7022. In addition, mortality reviews shall examine events immediately surrounding the inmate death to determine if appropriate interventions were undertaken.

**L.  Medical Safety and Sanitation**

51.   NCCC shall develop and implement written current site-specific blood borne pathogen and tuberculosis policies and procedures, including control plans consistent with Centers for Disease Control ("CDC") guidelines. Such plans shall include prompt evaluation of diagnostic reports and procedures to eliminate any unreasonable delay between identification and treatment of tuberculosis. NCCC shall train all staff on these plans on an annual basis. Only trained staff shall perform medical waste disposal and clean-up.

52.   NCCC shall develop and implement a written exposure control plan that is consistent with OSHA requirements.

53.   NCCC shall maintain a clean and safe environment in all medical areas, including establishing and implementing controls regarding dangerous medical instruments and medical waste disposal.

**M.  Inmate Education**

54.   NCCC shall implement a regular program for educating inmates on health related issues, including HIV education and counseling, other infectious diseases, diseases with which they have been diagnosed, and birth control education and counseling.

**N.  Quality Assurance and Improvement**

55.   NCCC shall develop and implement a written functional quality improvement program for medical and mental health care, which shall include development of a written quality improvement plan that includes annual self-evaluation, the provision of evaluations and recommendations regarding clinical guidelines, the selection of performance indicators, internal peer review and the establishment of a Quality Improvement Committee ("QIC"). The QIC shall be responsible for implementation of the quality improvement plan and shall serve as the conduit for all quality improvement activities.

56. The QIC shall be chaired by a physician and shall include a multi-disciplinary review necessary to properly review the status of health care provided to inmates and NCCC. The QIC chair may appoint subcommittees for focused work. The QIC shall meet ten (10) out of twelve (12) months each year, and shall record or take minutes of its meetings and maintain records of documents or files reviewed. The NCCC Quality Improvement Coordinator shall report monthly to the Sheriff, and to the chair of the NUMC's Quality Improvement Council.

57.   The quality assurance program shall include an annual work description; a work plan; and a program evaluation.

58.   The QIC shall develop written protocols for regularly providing workshops regarding the provision of medical and mental health care to clinical and administrative staff.

**III.  USE OF FORCE**

**A.  Staffing**

59.   NCCC shall require all Nassau County Sheriff's Department employees assigned to the Nassau County Sheriff's Department Division of Correction ("staff" or "correctional staff") to advise the Sheriff

or his designee in writing of any arrest or conviction, plea of guilty or nolo contendere to any felony or misdemeanor charge, or the issuance of any order of protection against the staff member within one week of such event, and shall require the staff member to advise the Sheriff or his designee in writing regarding any change in the status of any such matter. The failure to so report shall result in disciplinary proceedings. NCCC shall independently monitor the status of any matters reported to the facility by staff pursuant to this paragraph and shall evaluate the propriety of such staff's continued contact with inmates and remove staff from such contact where appropriate. All statements required in this paragraph shall be maintained in the files of the investigation unit and/or the employee's personnel file.

60.   NCCC shall request in writing that the District Attorneys of Nassau, Suffolk, Kings, Queens, Richmond, New York, and Bronx Counties notify the Sheriff or his designee of NCCC staff convictions or pleas described in paragraph 59. NCCC shall request in writing that the Nassau County Attorney's Office advise NCCC of any judgment, civil adjudication or settlement against a NCCC employee for actions filed pursuant to 42 U.S.C. ï½§ 1983 and of any adjudicated administrative determinations against NCCC employees or any administrative settlements entered by NCCC employees related to claims of discrimination. NCCC shall evaluate the propriety of such staff's continued contact with inmates and remove staff from such contact where appropriate.

61.   Prior to hiring, it is understood and agreed that the Nassau County Civil Service Commission shall perform all background checks on all candidates for correctional positions and shall evaluate the results of such checks in hiring or placement decisions. Such checks shall include a fingerprint check by the FBI; criminal arrest and conviction record; law enforcement agency check of addresses where the applicant has lived; military discharge status; investigation of any record of, or civil adjudications or settlements revealing assault, improper use of force, domestic violence, bias or discrimination.

## B.  Training

62.   NCCC shall provide at least one-hundred sixty (160) hours of pre-service training to all correctional staff, prior to staff being assigned to a platoon. The training shall include sufficient amounts of time devoted to use of force, use of force reporting, staff professionalism, diversity training, dealing with inmates with mental illness or mental health issues, dealing with female inmates, and potential criminal and civil liability for the use of excessive force. Use of force training shall include the following: (1) when force may be used; (2) alternatives to the use of force; (3) prohibitions against the use of excessive or unnecessary force; (4) control techniques intended to minimize injury to staff and inmates; (5) reporting and report writing; and (6) NCCC's policies and procedures regarding use of force developed and implemented pursuant to this Agreement.

63.   Correctional staff shall be interviewed by a committee that shall include a Deputy Undersheriff, psychiatric social worker or qualified health care professional and one member of the Training Academy. Following these interviews, the committee shall select staff members deemed appropriate for assignments to posts in the mental observation units or to specialized units with alcohol or drug dependent inmates. Staff assigned to such posts on a steady basis shall receive special training which shall include topics related to use of force, an overview of treatment issues, and to understanding and dealing effectively with these special populations. NCCC shall make reasonable efforts to make assignment to such posts voluntary.

64.   NCCC shall provide at least forty (40) hours of in-service training annually to correctional staff. Training shall include the use of force topics identified in paragraph 62, use of force reporting, staff professionalism, diversity training, potential criminal and civil liability for the use of excessive force, and stress reduction. NCCC shall develop and provide special in-service training to staff assigned to posts in

mental observation units and in specialized units with alcohol or drug dependent inmates. Such training shall include the topics described in the preceding paragraph. All correctional staff shall receive in-service training concerning issues related to dealing effectively with women inmates. The hours necessary for such training shall be determined by NCCC with input by DOJ. The training materials and course structure for the in-service training described in this paragraph shall highlight policies and procedures revised or implemented pursuant to this Agreement and shall be submitted to DOJ for review in accordance with the time frames for compliance set forth below.

65.   Correctional staff promoted to supervisory positions (sergeants, lieutenants, and captains) shall receive specialized training regarding NCCC's use of force policies and procedures, the role of supervisors in enforcing those policies and the investigation of use of force incidents prior to assumption of supervisory posts. Staff assigned to posts in the Training Academy shall also receive specialized training regarding NCCC's use of force policies and procedures and the subjects identified in paragraph 64, prior to assumption of such posts. The training materials and course structures shall be submitted for review and comment to the New York State Commission on Correction and to DOJ in accordance with the time frames for compliance set forth below. NCCC shall provide any written response by the Commission to DOJ.

66.   Within thirty (30) days of execution of this Settlement Agreement, copies of the Agreement shall be distributed to all correctional staff, and its terms shall be explained at roll calls by the Sheriff or his designee.

67.   Training academy staff shall develop, on an ongoing basis, scripts for roll call training directed at issues related to effective implementation of this Agreement. Roll call training shall be provided regularly and documented. Roll call scripts shall be provided to DOJ for its review in accordance with the time frames for compliance set forth below.

## C.   Policies and Procedures

It is acknowledged that NCCC is in the process of developing and implementing a use of force policy. NCCC's revised procedures and polices regarding the use of force shall include the following provisions:

68. The revised policies and procedures shall define the "use of force" as (1) the use of chemical agents; (2) the non-routine use of restraints (i.e. use of restraints for purposes other than routine purposes such as handcuffing inmates for transport); (3) the use of deadly force; (4) any physical contact with an inmate initiated by a staff member for the purpose of controlling the inmate's movement or behavior, provided, however, that the simple placement of an employee's hands on an inmate shall not constitute a use of force; (5) the use of any weapon (firearm, baton, etc.) even where no contact results (*e.g.* discharge of a firearm) provided, however, that threatening to use a weapon by waving or brandishing it shall not constitute a use of force; and (6) any of the above conduct used by inmates or other individuals against an inmate at the request or direction of correctional staff. The polices and procedures shall provide that (1) correctional staff may use physical force only when necessary and legally permissible; (2) correctional staff must make efforts to resolve inmate misconduct without the use of force, and if force is necessary, to utilize control techniques intended to minimize injuries to both inmates and staff; (3) the amount of force to be used is only the amount necessary to restrain the inmate or bring the situation under control; (4) physical force shall not be used as punishment, discipline, or retaliation against an inmate; (5) use of force shall not be used against an inmate because of the crime committed or alleged to have been committed by the inmate; (6) correctional staff are required to use a graduated response to inmate misconduct except where it would be dangerous or impracticable to do so; (7) K-9 units may be used for drug detection, cell searches, crowd control or escapes, but shall not be used in routine cell extractions or in routine security

situations; and (8) the use of excessive or unnecessary force, or failure to properly report same, will not be tolerated and will result in administrative disciplinary action. In addition, when the facts warrant, the unlawful or excessive use of force will be referred for criminal prosecution.

69.   The revised policies and procedures shall specifically allow the use of force to maintain order and discipline only in the following situations: (1) inmate attempting suicide or self-mutilation; (2) inmate engaging in destruction of valuable county property; (3) inmate engaging in injurious assault of another person; (4) inmate engaging in conduct that constitutes a threat of serious physical harm to another person; (5) inmate in the possession of a weapon; (6) inmate in the process of escaping; (7) correctional staff acting in self-defense, if the staff member cannot maintain a safe distance in complete safety without compromising security; (8) enforcement of institutional regulations in order to temporarily isolate or otherwise confine or secure an inmate where lesser means have proven ineffective; (9) prevention of a serious or violent crime or apprehension of an inmate who has committed such a crime; (10) quelling riots; (11) inmate disobeying an order where that disobedience is likely to cause serious bodily injury or threatens to escalate into a general disturbance; and (12) inmate engaged in conduct that causes a reasonable person to believe that the inmate is about to commit any offense listed in this paragraph.

70.   The revised policies and procedures shall prohibit the use of force: (1) where the inmate is engaged in verbal outbursts or verbal abuse of staff members, unless such verbal outburst is likely to incite a general disturbance which may cause injury to inmates, staff or visitors; (2) where the inmate is destroying his or her own property; (3) where the inmate is engaged in destruction of county property of insubstantial value; (4) to punish or retaliate against an inmate; (5) to discipline an inmate for failing to obey an order; (6) after an inmate has ceased to offer resistance warranting an initial use of force; and (7) where an inmate is restrained in a mechanical device, unless such force is the only available means of preventing serious physical injury to the inmate, staff or others.

71.   NCCC shall not extract an inmate from his cell ("cell extraction") unless necessary for the security, health and safety of inmates and staff. Force shall not be used in such situations unless the conduct is such that it is threatening the safety, security, health and safety of inmates and staff and all graduated responses to such conduct have been exhausted, or are deemed infeasible or impracticable.

72.   The revised policies and procedures shall prohibit the use of the following types of use of force: (1) employing a lateral neck restraint or choke hold; (2) intentionally causing an inmate to collide with or hit against a wall, floor or other object; (3) inappropriate use of otherwise appropriate weaponry or mechanical devices; and (4) striking an inmate with institutional equipment, including, but not limited to, keys, handcuffs and flashlights, except when there is no practical alternative to prevent imminent serious physical injury to staff, visitors or inmates. The revised policies and procedures shall emphasize that unless there is no practical alternative to prevent imminent physical injury to staff, visitors or inmates, kicks and blows to vital body parts (i.e., all parts of the head, solar plexis, groin, back of the neck, kidney and tailbone) shall be avoided, even when force is justified.

73.   The revised policies and procedures shall establish a use of force continuum that includes, at a minimum, the following categories of graduated responses and detailed procedures relating to the application of each type of response: (1) dialogue; (2) verbal commands; (3) non-impact, soft or passive control techniques; (4) chemical agents; (5) mechanical devices, such as electronic immobilization devices; (6) physical restraints; (7) impact weapons; (8) impact strikes; and (9) lethal force and dangerous weapons. NCCC shall develop and/or implement specific policies and procedures governing each type of force (e.g., chemical agents, mechanical devices, etc.) The use of force policy shall reference all policies and procedures governing each type of force. All policies and procedures relating to types of force shall be submitted to DOJ for its review in accordance with Section IV, paragraphs 121-123.

74.   The revised policies and procedures shall require correctional staff to notify his/her superior officer, who shall thereafter notify the Tour Commander, prior to using force, absent circumstances in which an immediate resort to the use of force is necessary. Such planned uses of force shall be under the direction of the Tour Commander and shall be videotaped. The revised policies and procedures shall provide that any correctional staff member using force without first notifying the Tour Commander must explain in detail why such notification was impracticable, describing with specificity the immediate threat of serious bodily injury to inmate(s), staff or visitor(s); immediate threat of inmate escape; or immediate threat of destruction of valuable property which preceded the use of force. The correctional staff member must describe the type of force used and why such force was necessary, and if the force used included or consisted of kicks and blows to the body (particularly to any vital body part), the correctional staff member shall explain why there were no alternatives to prevent serious imminent physical injury to staff, visitors or inmates. Upon a staff member's failure to follow the NCCC use of force policy, NCCC shall take appropriate action, which may include, but is not limited to, counseling, retraining, disciplinary action or referral to the District Attorney for criminal prosecution.

## D.   Videotaping

75.   NCCC shall maintain sufficient hand-held video equipment to record all planned uses of force and sufficient equipment for investigators and supervisors to view such videotapes. The Deputy Undersheriff of Operations shall be responsible for ensuring that videotape equipment is properly maintained. NCCC shall develop and implement policies and procedures for recording all planned uses of force to the extent practicable; for training personnel assigned to film uses of force in the use and maintenance of such equipment; for disciplining staff who fail to videotape incidents as required; for disciplining staff who tamper with the videotape machines or tapes; and for reviewing regularly the tapes. NCCC shall maintain the used tapes for three years to ensure that evidence is not destroyed or lost. No tapes containing relevant evidence shall be destroyed during the pendency of any civil, criminal, or administrative investigation, prosecution, or litigation.

## E. Reporting, Medical Examinations and Preservation of Evidence

76.   Unless the Tour Commander has been notified of a use of force pursuant to paragraph 74, the sergeant who is responsible for supervising the area where a use of force incident occurred shall page and notify the Tour Commander of the incident within thirty (30) minutes of the use of force. Upon receiving such notice, or when the incident has ended, the Tour Commander shall report all known facts to the Core Control Desk, i.e., the control center for the security staff on duty in the core facility. The Core Control Desk shall have the Undersheriff and/or Deputy Undersheriff responsible for investigations, or designee, paged and notified of the incident within sixty (60) minutes of notice of the incident. NCCC shall develop and implement a form for the contemporaneous recording of all notifications required in this paragraph.

77.   NCCC shall continue to require each correctional staff member involved in a use of force and each staff member who witnessed the use of force to complete a use of force report form, unless the staff member is incapacitated, in which case, he/she shall produce the report as soon as practicable, but no later than the staff member's completion of his/her first tour of duty upon resuming his/her duties. NCCC shall develop and implement policies and procedures requiring reports to be completed prior to the staff's member completion of his/her tour, and before the staff member leaves the facility, independently, based on the reporter's personal knowledge, without collusion with any other witness and without use of conclusory phrases (*e.g.*, "only the minimum and necessary amount of force was used").

78.   NCCC shall develop and implement a revised use of force reporting form that (1) requires a detailed and descriptive account of the incident based on the reporter's first hand observation and

knowledge and (2) includes spaces for relevant standardized information such as the name and badge number of involved staff, the location of the incident; a description of the inmate's conduct that precipitated the use of force; a description of the actions of all other individuals observed by the reporter; a description of the verbal persuasion or warning preceding the use of force and the inmate's response; whether the Tour Commander was notified prior to the use of force, and if not, an explanation for the failure to do so; whether the use of force was videotaped; whether the inmate was armed, and if so, the type of arms; whether injuries were sustained, and by whom; whether control holds were employed; the specific type of force that was used; whether chemical spray or any other force or restraint device was used; the time that medical staff examined the inmate and staff; and the names of all inmate and staff witnesses.

79.   NCCC shall develop and implement policies and procedures that require the Tour Commanders to assign a "designated sergeant" to review the use of force reports. The sergeant responsible for supervising the area where the use of force incident occurred shall be so designated unless he/she authorized, witnessed, or participated in the use of force incident. In such cases, the Tour Commander shall assign another sergeant on duty to review the reports. The designated sergeant shall review the report for completeness and accuracy. If the designated sergeant determines that the report(s) is not complete or accurate, the sergeant will direct the writer of the report to submit an addendum to the report. The designated sergeant shall review the use of force report within four (4) hours of receipt and shall forward it, and any addendum, to the Tour Commander.

80.   The designated sergeant shall conduct an initial investigation of the use of force which shall include interviews of staff and inmates. During this review, the designated sergeant shall take appropriate steps to ensure that physical evidence subject to destruction or loss or medical evidence subject to change is or has been investigated. The NCCC shall develop and implement a reporting form to be completed by the designated sergeant. The form shall be provided to DOJ for review and input in accordance with the time frames set forth below. The designated sergeant shall complete and forward the report to the Tour Commander.

81.   In addition to filing the required reports, participants and witnesses to a use of force who believe that they observed a violation of institutional policy shall be required to timely report this information directly to the Sheriff's Bureau of Investigations ("SBI"), either orally or by separate memorandum.

82.  Staff claiming injury shall be provided an opportunity to be examined and treated by NCCC medical staff. The use of force form shall describe such examination and treatment, if any.

83.   Immediately after a use of force, staff who neither participated in, nor witnessed the incident shall escort the inmate who was the subject of such force to the medical unit (or NUMC) for examination by medical staff and for appropriate medical treatment except in those situations requiring employment of the Sheriff's Emergency Response Team ("SERT") where member of the SERT team shall escort the inmate to the medical unit (or NUMC).

84.   NCCC shall develop and implement written policies and procedures for investigating and tracking injuries to inmates. Such procedures shall include, at a minimum, requirements that designated correctional personnel: review each such injury report; interview inmates who refuse or are unable to sign the section of the form describing the cause of the injury; conduct full investigation where an inmate's injuries are inconsistent with the claimed basis for the injury; and conduct full investigation where the reporting correctional staff member is one whose name is reported on the quarterly report described in paragraph 107.

85.    NCCC shall require medical personnel to record all injuries and report suspicious injuries (*e.g.*, unexplained, serious or multiple injuries to an inmate; injuries resulting in the inmate being hospitalized and injuries involving the inmate's head or genital areas; body welts) directly to the Sheriff or his designee. In such instances, the Sheriff or his designee shall take prompt steps to document the injury through photographic or recording devices. NCCC shall maintain enough working cameras to record such injuries, and shall identify and preserve all such evidence as part of the investigative package, i.e., all reports and evidence.

86.    Immediately following a use of force, the Tour Commander shall ensure that all relevant evidence, including weapons and contraband, is collected, tagged, identified and stored, and that, where necessary, the scene of the incident is photographed. All evidence relating to the incident shall be properly stored and preserved for three (3) years.

87.    The Tour Commander will review all use of force reports, including the videotape, if the incident was recorded. The Tour Commander will submit a use of force report to the appropriate captain. The captain will review the use of force reports and record his or her conclusions or recommendations on a form to be forwarded to the appropriate Deputy Undersheriff and the SBI within seven (7) business days of the incident.

88.    The Deputy Undersheriff for Investigations or his designee shall conduct an initial review of each report within twenty-four (24) hours of receipt to ensure thoroughness and completeness. The Deputy Undersheriff for Investigations shall direct the report's author(s) to promptly complete incomplete reports, or shall conduct an interview and note the party's responses where clarification or additional information is needed. SBI shall maintain all versions of the report. During this review, the Deputy Undersheriff for Investigations or his designee shall take appropriate steps to ensure that physical evidence subject to destruction or loss or medical evidence subject to change is or has been investigated and to check the possible discharge dates of inmate witnesses to ensure that such witnesses are interviewed timely.

89.    NCCC shall develop and implement policies and procedures for promptly removing staff from contact posts, where appropriate, following a use of force incident which indicates that the use of force may have been excessive or unnecessary.

90.    A committee including the Deputy Undersheriff for Investigations, the Deputy Undersheriff for Security, the Deputy Undersheriff for Operations, the Sheriff or his designee, a representative from the Training Academy and a representative of the medical staff, when indicated, shall review all use of force reports on a monthly basis. The committee shall (1) write a report of each review; (2) timely refer all suspicious use of force reports to the SBI for investigation including, but not limited to, incidents involving unexplained, serious or multiple injuries to an inmate; incidents resulting in the inmate being hospitalized and incidents involving impact strikes to the inmate's head or genital areas; and (3) for any use of force not compliant with policy, recommend taking appropriate steps to impose discipline, training, or other remedial measures.

F.   **Investigations**

91.    SBI shall review all use of force investigative packages to determine whether further investigation by SBI is necessary. NCCC shall develop and implement reasonable criteria by which SBI shall make this determination, including, but not limited to, whether the use of force: (1) suggests a possible violation of NCCC policy; (2) involved staff who have been disciplined or are or have been the subject of any disciplinary, criminal or civil proceedings based on an alleged use of excessive force or failure to properly report such incidents or, have previously had two or more complaints of unnecessary

or excessive use of force filed against them; (3) involved an inmate charged with or convicted of a sex crime or crimes against law enforcement personnel or children; (4) involved retaliation against an inmate who previously filed a use of force complaint; (5) involved kicks, strikes or blows to the head or other vital areas of an inmate's body; and (6) involved injuries to an inmate that are inconsistent with the claimed basis for the injury. Where SBI determines that no further investigation is necessary, it shall set forth the reason(s) for that decision in writing. To the extent that SBI determines that any investigation reveals issues that should be addressed through additional training or otherwise, it shall make appropriate referrals of the matter to NCCC supervisory and/or training staff. Notwithstanding the foregoing, SBI shall investigate all allegations of unnecessary or excessive use of force: (1) reported to SBI by inmates or third parties that were not previously reported to the facility; (2) found to be substantiated by the investigating Sergeant or Tour Commander; and (3) referred to SBI by the committee described in paragraph 90.

92.    SBI shall review all grievances alleging unnecessary or excessive force and transmit such grievances to the appropriate correctional staff, *e.g.*, supervisory sergeant or Tour Commander, for investigation. The investigation shall be conducted pursuant to the procedure set forth in paragraph 80, including, but not limited to, the assignment of an uninvolved sergeant to conduct the investigation. SBI shall thereafter review the investigatory package generated from the grievance in accordance with the procedure set forth in paragraph 91.

93.    All SBI investigations of the use of unnecessary or excessive force shall be completed within sixty (60) days. The basis for any delays exceeding sixty (60) days shall be documented. The Undersheriff for Investigations shall maintain records tracking the timing of investigations.

94.    SBI shall interview all staff and inmate participants and witnesses. Exceptions to this requirement shall be contained in a detailed written protocol established by the NCCC and the Nassau County District Attorney's Office. If the matter becomes the subject of a criminal investigation SBI shall interview the correctional staff member(s) within ten (10) working days of notification of the closing of the criminal investigation and shall gather all non-grand jury evidence collected or obtained during the District Attorney's investigation.

95.    SBI shall produce explicit and comprehensive findings as to each use of force investigation initiated pursuant to paragraph 91, resolving, when possible, disputed matters with reference to particular evidence in the investigative file.

96.    All "Injury to Inmate" forms shall be reviewed by SBI to determine whether investigation is necessary in accordance with the policies and procedures set forth in paragraph 91 of this Agreement.

97.    Within sixty (60) days after the execution of this Agreement, NCCC shall provide DOJ with a list and description of its pending investigations regarding use of unnecessary or excessive force identifying which cases have been pending for more than sixty (60) days ("backlogged matters"). NCCC shall make good faith efforts to resolve all backlogged matters within ninety (90) days of the completion of this Agreement.

### G. Investigators' Training and Procedures

98.    NCCC shall staff the SBI with sufficient personnel to complete the responsibilities outlined in this Agreement. NCCC shall use its best efforts to assign staff to SBI who volunteer for such posts. NCCC shall use its best efforts to assure that a minimum of forty (40) hours of specialized training in investigations shall be provided to all current SBI investigators within sixty (60) days of the execution of

this Agreement and to all future SBI investigators within thirty (30) days of assignment to the post, unless impracticable.

99.   NCCC shall develop and implement written procedures outlining steps and methods for investigating allegations of improper uses of force. Such procedures shall include: timetables for conducting investigations; procedures for interviewing witnesses; procedures for evaluating physical, medical and witness testimony; requirements for utilizing medical and other experts; procedures for utilizing the data base described in this Agreement; witness and evidence checklists and a format for reporting the results of investigation. Among other things, the procedures shall provide that special weight shall not be given to information from witnesses because of their status as inmates or staff. The procedures shall be provided to DOJ for its review and approval in accordance with the procedures and time frames set forth below in Section IV, paragraphs 121 and 123.

100.   Where appropriate or necessary, SBI shall work with experts to evaluate forensic and medical evidence.

101.   Based upon the information obtained or provided to the Sheriff in compliance with the requirements set forth in paragraphs 59 and 60, SBI shall determine whether a staff member who is the subject of an unnecessary or excessive use of force investigation was arrested, convicted or pled guilty or nolo contendere to any felony or misdemeanor charge, or the issuance of any order of protection or whether that individual has been the subject of any judgment, civil adjudication or settlement of actions filed pursuant to 42 U.S.C. ï½§ 1983 or the subject of any settlement or adjudicated administrative determination by the Suffolk County Commission of Human Rights, Nassau County Commission of Human Rights, New York State Division of Human Rights and/or Equal Employment Opportunity Commissions.

102.   NCCC shall develop and implement written policies and procedures for maintaining and completing logbooks to ensure that they are accurate, complete and sufficiently descriptive. Such policies and procedures shall require that staff log injuries to inmates, accidents, unusual incidents, and accurately record which staff members are on duty.

103.   SBI shall develop and implement procedures to identify possible complaints of alleged staff retaliation against inmates who have filed use of force complaints. Such procedures shall include reviewing regularly inmate disciplinary forms, inmate grievances and complaints filed by staff with the Nassau County District Attorney alleging criminal conduct by inmates reportedly resulting in injury to staff. SBI shall take appropriate steps to input such data in the computerized data base referred to in paragraph 104, or in another trackable data base.

104.   SBI shall develop and implement a comprehensive and up to date computerized data base tracking complaints, grievances, incident reports, civil litigations, criminal prosecutions, and notices of claim involving the use of force, inaccurate reporting of use of force or failure to report use of force, whether substantiated or not. The data base shall also include complaints and grievances alleging bias against inmates based on gender, race, religion, age, ethnicity, sexual orientation, national origin or disability. The data base shall include the dates the investigation was commenced and completed, the names of assigned investigators, the date, outcome of the investigation, time and location of incidents, names and identification numbers of all witnesses and participants, names of supervisors on duty, injuries to staff or inmates, type of force used, reason given by staff for use of force, experts utilized, discipline and informal management responses to reported allegations. The data base shall also include injuries to inmates reported as slips and falls, or collisions with doors, walls or cell gates. The data base shall also include injuries to inmates charged with or convicted of sex crimes or crimes against law enforcement

personnel or children. The data base shall be searchable by any of the elements included. Investigators, management and personnel officers shall have access to this data base. NCCC shall make diligent efforts to include in the computerized data base information from January 1997 forward and shall document its efforts to obtain such information.

## H.   Discipline and Management Responses

105.   NCCC shall discipline appropriately any correctional staff found to have (1) engaged in use of unnecessary or excessive force; (2) failed to report or report accurately the use of force; (3) retaliated against an inmate or other staff member for reporting the use of excessive force; or (4) interfered or failed to cooperate with an investigation regarding use of force.

106.   NCCC shall utilize informal management responses to address unacceptable staff behavior (*e.g.*, making gratuitous remarks to inmates or goading inmates) which does not warrant the imposition of penalties referred to in paragraph 110 including counseling, increased supervision, referral to an employee assistance program, additional training or reassignment to different posts. To address conduct described in pararaph 105, defendants shall impose penalties referred to in paragraph 110 and shall consider utilizing informal management responses described in this paragraph.

107.   Using the data base described in paragraph 104, NCCC shall track and monitor allegations regarding use of force by staff. At least quarterly, NCCC shall search the data base. All staff who are shown in a quarterly review to have been the participant in more than two (2) use of force or improper reporting allegations within the past five (5) years shall be the subject of a management review. Informal management responses shall be taken with regard to such staff, if appropriate. Quarterly reviews and all action taken pursuant to this provision shall be documented.

108.   In connection with staff promotions, the Sheriff will consider all items in staff personnel files and in all records maintained by the Nassau County Sheriff's Department.

109.   The committee described in paragraph 90 shall review on a quarterly basis the quarterly reviews described in paragraph 107, shall discuss substantiated uses of excessive force, and shall make recommendations, if appropriate, concerning modifications in policy, training, discipline, or other remedial measures.

110.   NCCC shall develop and implement guidelines for the imposition of discipline. Such guidelines shall set forth the type of discipline (i.e. fine; reprimand; denial of the next year's increment; loss of leave entitlement; suspension without pay; demotion in grade and/or step; dismissal) to be imposed for violations of the policies and procedures established pursuant to this Agreement, and if applicable, the duration and/or amount of such discipline, not inconsistent with New York State Civil Service Law and any applicable collective bargaining agreement(s).

## I.   Inmate Education and Inmate Reporting

111.   NCCC shall permit inmates to report allegations of the use of excessive force orally, through grievance forms (which shall be available in all housing units at all times without the need to request one from a staff member) or letters which may be submitted to any staff member or placed in the mail. NCCC shall provide a secure and confidential method for delivery of such grievances or letters such as a secure lockbox in an area accessible to inmates. NCCC shall notify inmates of receipt of their grievances or letters in writing.

112.    As part of inmates' orientation process, NCCC shall provide inmates with an inmate handbook which includes (1) a statement that NCCC prohibits use of excessive force by correctional staff; (2) a general description of when and how force may be used, including the use of chemical agents; (3) a description of how to report the excessive use of force, including when, how, and to whom it should be reported; (4) a statement that NCCC prohibits retaliation for reporting the use of excessive force; (5) an explanation of staff members' duty to report the use of excessive force; and (6) procedures for sick call and for obtaining mental health, dental, and substance abuse treatment. Such materials shall be available in English, Spanish, and Braille and shall be distributed to all current inmates. The handbook shall be subject to DOJ review and approval in accordance with the procedures and time frames set forth below in Section IV, paragraphs 121-123. NCCC shall add to the orientation video shown to incoming inmates the information described in this paragraph. To the extent practicable, the video shall be available in the above languages and with closed captioning.

113.    NCCC shall post and maintain in all living areas and in other areas in which inmates spend significant time (such as library and recreation), visible posters in English and Spanish setting forth the procedures and telephone numbers for reporting complaints. This information shall be available in Braille to blind inmates.

114.    A summary of this Agreement shall be created by the Joint Expert, reviewed by the parties and made available to inmates in the law library.

**J.  Quality Assurance**

115.    The Deputy Undersheriff for Investigations shall report on a bi-weekly basis to the Sheriff regarding SBI's work, including the timeliness of investigations, findings and patterns.

116.    NCCC shall develop policies and procedures for conducting periodic, confidential, random interviews of inmates regarding conditions of confinement, including provision of medical and mental health care and the use of force. Inmates shall be advised that participation is voluntary and that they will not be subject to retaliation for information provided. All information shall be recorded and maintained.

117.    NCCC shall develop written quality assurance policies and procedures to ensure complete, effective, and unbiased investigations and to regularly assess compliance with the terms of this Agreement pertaining to use of force and investigations.

**IV.  Compliance**

118.    Upon execution of this Settlement Agreement, the United States shall file a Complaint in District Court contemporaneously with the parties' joint motion for entry of an Order conditionally dismissing the action, pursuant to Fed. R. Civ. P. 41(a)(2), conditioned upon NCCC achieving substantial compliance with its terms. This Settlement Agreement shall be attached to such motion. The motion will request that the case be placed on the Court's inactive docket, though the Court shall retain jurisdiction over the case until a final dismissal.

119.    "Substantial Compliance" with the terms of the Settlement Agreement shall fully satisfy the Settlement Agreement.

120.    DOJ shall have reasonable access to NCCC inmates and staff, NCCC documents and information relating to implementation of this Settlement Agreement for the purpose of monitoring the implementation of this Agreement.

121.   All written policies and procedures relating to the use of force required under this Agreement to be reviewed and/or approved by DOJ shall be submitted to DOJ and an expert to be agreed upon by DOJ and NCCC (the "Joint Expert") within ninety (90) days of the execution of this Agreement.

122.   All written policies and procedures relating to medical care required under this Agreement to be approved by DOJ shall be submitted to DOJ within ninety (90) days of the execution of this Agreement. DOJ shall notify NCCC in writing as to whether it approves the revised policies and procedures.

123.   In the event that DOJ or the joint expert do not approve policies and procedures required to be approved pursuant to the terms of this Agreement, the parties will agree to a schedule for NCCC to submit revisions for appropriate approval.

124.   NCCC shall implement policies and procedures approved by DOJ within forty-five (45) days of approval.

125.   Upon fifteen (15) days notice, NCCC shall provide DOJ and the Joint Expert with any documentation requested that is not subject to the attorney-client privilege. The Joint Expert and representatives for DOJ, including its experts, shall conduct an initial on-site compliance monitoring tour: i) regarding medical issues approximately four months after execution of this Agreement; and ii) regarding use of force issues approximately six (6) months after execution of this Agreement. The duration of the on-site compliance monitoring shall be determined by DOJ. NCCC shall provide the Joint Expert and DOJ with reasonable access to inmates and staff, NCCC and NUMC documents, and information relating to implementation of this Settlement Agreement.

126.   Within twelve (12) months after execution of this Agreement, DOJ shall conduct a second on-site compliance monitoring tour of NCCC.

127.   DOJ shall conduct a third on-site compliance monitoring tour of NCCC to evaluate NCCC's compliance with this Agreement approximately twenty-four (24) months after execution of this Agreement. Upon the reasonable request of DOJ or the Joint Expert, NCCC shall permit site visits on a more frequent basis than set forth in Paragraphs 125 through 127. If NCCC has substantially complied with the Settlement Agreement, DOJ and NCCC will file a joint motion to dismiss the case.

128.   If DOJ determines that NCCC has not substantially complied with this Agreement, the United States may file a motion to restore the case to the Court's active docket for purposes of litigating the allegations in the Complaint.

129.   The United States reserves the right to file a motion to restore this case to the Court's active docket for purposes of litigating the allegations in the Complaint at any time if it believes NCCC is not making a good faith effort to substantially comply with the Settlement Agreement. The United States shall give NCCC fourteen (14) calendar days' written notice before the filing of such motion.

130.   In the event that the allegations in the underlying complaint are litigated (i.e. through a trial or dispositive motions), this Settlement Agreement shall not be introduced or used as evidence.

131.   This Agreement shall be binding on all successors, assignees, employees, and all those working for or on behalf of the defendants to this action.

132.   Notice under this agreement shall be provided by Federal Express overnight delivery and shall be provided to the Sheriff of Nassau County and to NCCC's counsel as designated by written notice to

DOJ.

For the United States

/s/ Alan Vinegrad

ALAN VINEGRAD
United States Attorney
Eastern District of
New York

/s/ Sanford M. Cohen

SANFORD M. COHEN
Chief, Civil Rights
Litigation

/s/ Marla Tepper

MARLA TEPPER
PAMELA CHEN
Assistant U.S. Attorneys
U.S. Attorney's Office
Eastern District of
New York
147 Pierrepont Plaza
Brooklyn, New York 11201

/s/ Ralph F. Boyd

RALPH F. BOYD, JR.
Assistant Attorney General
Civil Rights Division

/s/ Steven H. Rosenbaum

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

/s/ Mellie H. Nelson

MELLIE H. NELSON
Deputy Chief
DANA SHOENBERG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section

P.O. Box 66400
Washington, D.C. 20035-6400

For Nassau County

/s/ Thomas Gulotta

THOMAS GULOTTA
Nassau County Executive

/s/ Alfred F. Samenga

ALFRED F. SAMENGA
Nassau County Attorney

/s/ Edward Reilly

EDWARD REILLY
Sheriff of Nassau County